[Civ. No. 15101. First Dist., Div. One. June 18, 1952.]

THEODORE PETRIKIS et al., Respondents, v. LOUIS P. HANGES, Appellant.

Harry H. Baier for Appellant.

James C. Purcell, William E. Ferriter and William Petros for Respondents.

BRAY, J.—Defendant appeals from a judgment in favor of plaintiffs and from an order denying his motion to vacate that judgment.

QUESTIONS PRESENTED

1. Sufficiency of the evidence to support the findings.
2. Could Petrikis bind his partner Ellis?
3. What was the effect of defendant's taking possession?
4. Damages incurred during possession.

FACTS

Plaintiffs, as partners, owned and operated the "Chariot Bar and Cocktail Lounge." On April 30, 1948, all signed this document: "We the undersigned hereby agree to sell our interests in the Chariot Bar and Cocktail Lounge located at 1132 Market Street San Francisco, California. If and when the sale takes place and after all bills are accounted for the remainder of the money is to de [sic] divided according to the share each partner now attains in the the [sic] said business." Thereafter Petrikis negotiated with defendant for the sale of the business to defendant. On January 5, 1949, at the office of Attorney Rubenstein, who was the attorney for defendant and became the escrow holder in the transaction, the following instrument was drawn. It apparently was dictated to Rubenstein's secretary by defendant with Petrikis putting "some words in it." It reads: "I have today received from LOUIS PAUL HANGES $17,500.00 in the form of Cashier's Check on Bank of America N. T. & S. A., Powell-Post Branch, to be held in escrow by me, in the matter of the purchase of the restaurant and a bar known as the CHARIOT, located at 1132 Market Street, San Francisco, with the understanding that Mr. Hanges is to take possession within 24 hours of this date and take an inventory as of the 5th day of January, 1949. All open stock behind the bar is included in the purchase price of $17,500.00, and all stock not opened shall be paid for by Mr. Hanges at the present market price thereof. All pro rations of insurance

and rent are to be assumed by Mr. Hanges from the date of possession. Any deposits on gas and water utilities and on Sales Tax Permit shall be refunded to the Sellers.'' It was then signed ''DAVID RUBENSTEIN by Ingrid Josephson Secretary'' and ''AGREED AND ACCEPTED: Theo Petrikis Louis Paul Hanges.'' Defendant then delivered to the secretary a cashier's check for $17,500. Rubenstein drew a formal ''Agreement to Purchase'' the business, good will, etc. It also provided that the sellers were to deposit not later than January 13 with the escrow holder a bill of sale and a five-year lease to defendant of the premises. The transfer of the money and documents was to take place upon completion of the statutory notice of intended sale. There was a provision for refund of the purchase price in case the lease or a transfer of the liquor license could not be obtained. The agreement also provided that the bill of sale should contain a covenant that plaintiffs would not directly or indirectly ''enter into the restaurant or bar business within a radius of five (5) blocks'' of the premises for a period of five years. On January 6, in Rubenstein's office, all plaintiffs, except Ellis, signed the agreement, as did defendant. The agreement provided that defendant was to have possession as of commencement of business that very day. The evening before (January 5) an inventory of the stock was taken by Petrikis, Ellis and defendant. Defendant then took possession and had the locks changed. On the 6th, after the agreement to purchase had been signed by defendant and all plaintiffs except Ellis, Petrikis took one of the originals to Ellis to sign. Ellis did not like the restriction against engaging in a similar business. The next day (the 7th) Ellis went to see Rubenstein. Ellis testified that he told Rubenstein he wanted to think the restriction over and that Rubenstein advised him to see another attorney about it, as he represented defendant and might have to prosecute Ellis if he violated the restriction. Ellis denied that he told Rubenstein he would not sign the agreement. Rubenstein testified similarly to Ellis as to advising Ellis to see another attorney, but testified that Ellis flatly stated that he would not sign the agreement with that provision in it, ''even if it killed the deal.'' He asked Rubenstein to find out if defendant would consent to change the radius mentioned to two blocks. Ellis left the office and Rubenstein notified defendant of his conversation with Ellis and of the fact that Ellis had not signed the agreement. Defendant then called the deal off. Rubenstein immediately

(all of this occurred on January 7) phoned Petrikis that he had been notified by defendant that the deal was off. The same day Ellis phoned Rubenstein and asked what defendant had said about changing the block limitation and Rubenstein told Ellis that the deal was off. Ellis claims he then told Rubenstein that he had signed the contract and that he was coming to his office to sign the other copies. Defendant stayed in the premises, Ellis working one shift, until January 9 when an inventory was taken and the keys given plaintiffs. Ellis claimed he was hired by defendant for this period. Defendant denied it.

## FINDINGS

The court found that by the receipt of January 5, 1949, plaintiffs and defendant entered into a formal agreement evidenced by a written memorandum wherein plaintiffs agreed to sell and defendant to buy the said business; that said memorandum was complete and binding on defendant and all plaintiffs, although informal, and was signed by plaintiffs through their authorized agent, Petrikis (whose authorization was in writing), and that it was contemplated that the agreement of January 5 would be reduced to "a more formal writing expressing the same terms and conditions and containing provisions for the transfer of the lease and license . . ." which provisions were contemplated by the memorandum, and that it was not the intention of the parties that the effect of the agreement of January 5 should be deferred until, or dependent upon, the execution of the more formal writing; that it was not contemplated by the parties that there were to be any further negotiations nor any terms or conditions other than those contained in and contemplated by that memorandum; that the restrictive clause was not contemplated by the memorandum and was inserted by Rubenstein for the further protection of his client, defendant; that plaintiffs tried to sell the business to other buyers and on February 21, 1949, sold it for $12,000, the reasonable market value thereof, and that because of defendant's repudiation of his obligations under the agreement of January 5 and the more formal document of January 6 defendant is liable to plaintiffs in the sum of $5,500 (the difference between the $17,500 contract price and the reasonable market value of the business), plus bills incurred by defendant while in possession of the business and unpaid in the sum of $267.25,

which plaintiffs were required to pay, and plus the value of plaintiffs' stock sold by him in the sum of $326.89. The court gave judgment for those amounts. Thereafter defendant moved to set aside the judgment on the ground that the conclusions of law were not supported by the findings. The motion was denied.

1. *Sufficiency of the Evidence.*

Rubenstein testified that he prepared the agreement of purchase at the request of defendant and Petrikis. Defendant testified that it was Petrikis' suggestion that the restrictive clause be inserted in the agreement and that he, defendant, agreed with it. Petrikis did not deny it. Hence, the finding that the clause was inserted by the attorney for the further protection of defendant is not strictly supported by the evidence. However, the question of how it got into the agreement is unimportant. The court also found, in effect, that Ellis did not refuse to sign the agreement but merely wanted a short delay until he obtained independent legal advice. In other words, the trial court believed Ellis' version of the conversation rather than Rubenstein's. That, too, is unimportant, for the evidence clearly shows that defendant had called the deal off before Ellis signed or offered to sign. Either defendant was bound by the receipt memorandum or he was not. If he was not, he could withdraw his offer any time before all partners signed the agreement, whether Ellis said he would not sign or merely wanted more time. This brings us to the question—

2. *Could Petrikis Bind Ellis?*

The court found that he could, holding in effect that the document of April 30, 1948, authorized Petrikis to bind his partners in the sale of the business. However, an examination of this document does not support this conclusion. It is merely a statement that the partners will sell their business. It provides no price, and, more important, does not authorize any partner to make the sale, bind his partners, or enter into any agreement of sale on behalf of his partners. But, argue plaintiffs, even without this writing, one partner may bind another partner in the partnership business. While that is true with reference to the transaction of the business it does not apply to a sale of the assets of the partnership. Corporation Code, section 15009 (formerly Civ. Code, § 2403) provides: "(3) Unless authorized by the other partners or unless they have abandoned the business, one or more but less than all the partners have no authority

to: . . . (b) Dispose of the good will of the business. (c) Do any other act which would make it impossible to carry on the ordinary business of a partnership." (See *Cowan* v. *Tremble*, 111 Cal.App. 458 [296 P. 91]; *Moropoulos* v. *C. H. & O. B. Fuller Co.*, 186 Cal. 679 [200 P. 601].) Therefore, neither the signing by Petrikis of the memorandum of January 5 nor by all the other partners of the agreement to purchase could, or did, bind Ellis. ▮ As all of the partners were not bound, neither was defendant. The effect of his signature on the two documents was, at best, an offer to purchase, accepted only when all partners had signed and bound themselves. Before that event occurred, defendant withdrew his offer. While the evidence is susceptible of the conclusion drawn by the court that Ellis had not refused to sign but merely delayed signing pending efforts to eliminate the restrictive clause which the court found was not contemplated by the original understanding as embodied in the receipt memorandum, and assuming, as found by the court, that under such memorandum it was not the intention of the parties signing it that the effect of the agreement should be deferred until, or dependent upon the execution of the more formal writing, nevertheless the evidence conclusively shows that with or without the reason that defendant believed Ellis to have refused to sign, defendant withdrew from the transaction before Ellis signed and before Ellis was bound as a party to the transaction.

It might be pointed out that it is very doubtful if the court's finding that the memorandum set forth the complete understanding of the parties signing it, and that there was to be no further negotiations, is supported by the evidence. Certainly some of the terms set forth in the agreement of purchase were not included in the memorandum, and there is no evidence that all of them were considered prior to the execution of the memorandum. These are: (1) the requirement that a notice of intended sale be given; (2) a new lease be obtained, rather than an assignment of the existing lease; (3) its terms; (4) the agreement contains a breakdown of the valuations placed on specific items (for example, the good will is valued at $50); (5) the restrictive covenant. However, it is immaterial whether the agreement merely formally included the terms of the memorandum or not, as neither document is binding because not signed by all the parties.

### 3. Possession.

█ Defendant testified that he did not take possession of the premises. The court found that he did, pursuant to the provisions of the memorandum, and there is ample evidence to support that finding. But his being in possession at the time and for two days after he withdrew from the transaction does not affect his right to withdraw before all the sellers were bound to sell to him. The delivery of possession both as to defendant and Ellis was conditional upon the execution of a binding agreement. It is not, as contended, a situation of an acceptance of the benefits of a transaction binding the acceptor to assume the obligations. (Civ. Code, §§ 1589, 3521.) The entry into possession alone could not bind defendant to a contract to which Ellis was not bound, and before Ellis signed defendant notified all parties of the withdrawal of his offer.

### 4. Damages.

The court found that during the approximately four days defendant was in possession he incurred bills in the sum of $267.25 which plaintiffs were compelled to pay, and that defendant used and sold stock on hand to the value of $326.89. While evidence as to these items of damage is conflicting, we are bound by the court's finding thereon and hence the judgment as to the total of those amounts, $594.14, is proper.

The judgment and the order are reversed as to all amounts in excess of $594.14, and are affirmed as to that amount. Plaintiffs will pay costs.

Peters, P. J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied July 18, 1952, and respondents' petition for a hearing by the Supreme Court was denied August 14, 1952. Carter, J., was of the opinion that the petition should be granted.