[Civ. No. 66028. Second Dist., Div. Five. May 10, 1983.]

SEYMOUR OWENS, Plaintiff, Cross-defendant and Appellant, v.
PALOS VERDES MONACO et al.,
Defendants, Cross-defendants and Appellants;
KAJIMA INTERNATIONAL, INC.,
Defendant, Cross-complainant and Appellant.

## COUNSEL

Pacht, Ross, Warne, Bernhard & Sears, Ira H. Lurvey and Judith Salkow Shapiro for Plaintiff, Cross-defendant and Appellant.

Hufstedler, Miller, Carlson & Beardsley, Seth M. Hufstedler, Shirley M. Hufstedler and Jerome H. Craig for Defendant, Cross-complainant and Appellant.

Allan A. Sigel for Defendants, Cross-defendants and Appellants.

## OPINION

**FEINERMAN, P. J.**—Appellants appeal from a judgment ordering specific performance of an agreement for the purchase and sale of 57 acres of unimproved land in Palos Verdes.

The subject property was owned by Monaco Land Holders (MLH), a general partnership. At the time of trial, the three general partners of MLH were Seymour Owens (Owens), Albert Fink (Fink), and Pearl A. Borinstein (Pearl) as trustee under certain trust agreements for the benefit of her daughter Joan Nancy Borinstein (Joan).

Suit was originally brought by one of the partners of MLH, Owens, for declaratory relief and injunctive relief seeking to prevent the sale of the subject property. Kajima International Inc., a California Corporation (Kajima), the proposed buyer of the property, cross-complained for specific performance and reformation. Also included in the cross-complaint was a claim against the sellers for damages based on tort theories of conspiracy to induce breach of contract, negligent misrepresentation and breach of warranty of authority and fraud.

By stipulation of the parties, the suit was bifurcated and issues at trial were limited to Owens' claim for declaratory and injunctive relief and Kajima's claim for specific performance. Prior to trial the trial court granted Kajima's motion for summary adjudication of its claim for reformation. The reformation substituted the name of MLH as the selling entity in the disputed agreement in place of Palos Verdes Monaco (PVM).[1]

After a court trial, judgment for specific performance was rendered in favor of Kajima and Kajima's tort causes of action were ordered dismissed with prejudice "in light of the favorable disposition of its First Cause of Action for Reformation and Second Cause of Action for Specific Performance." Owens' complaint for declaratory relief and injunction was also dismissed with prejudice.

Owens, PVM, MLH, Fink, Pearl, Joan, etc. appeal from the judgment. Kajima cross-appeals from that part of the judgment which dismissed the fourth cause of action of its cross-complaint for damages for conspiracy to interfere with economic relations.

In setting forth the facts proved at trial, we are mindful of the rule which governs appellate review of the evidence and which is succinctly stated in *Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, at pages 925-926 [101 Cal.Rptr. 568, 496 P.2d 480], "[W]e are bound by the established rules of appellate review that all factual matters will be viewed most favorably to the prevailing party [citations] and in support of the judgment [citation]. All issues of credibility are likewise within the province of the trier of fact. [Citation.] 'In brief, the appellate court ordinarily looks only at the evidence supporting the successful party, and disregards the contrary showing.' [Citation.] All conflicts, therefore, must be resolved in favor of the respondent. [Citation.]" (Italics omitted.) (See *Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183]; *Emerick* v. *Raleigh Hills Hospital* (1982) 133 Cal.App.3d 575, 580 [184 Cal.Rptr. 92].)

## FACTS

The subject property was originally acquired by MLH in 1959. At that time Owens, Herbert Kronish (Kronish) and Manny Borinstein (Borinstein) acquired 250 acres of unimproved land in the Palos Verdes area. The three men formed four different partnerships and divided the 250 acres among the partnerships. One hundred and twenty-eight acres were transferred to MLH, and the 57-acre parcel which is the subject of this action was part thereof. The original partners

---

[1]PVM is a limited partnership owned and controlled by the same people who are principals in MLH. At the time of the purported sales transaction, sellers believed that the subject property was owned by PVM rather than MLH.

of MLH were Owens, Kronish and Borinstein. The other partnerships were PVM, P.V.M. Commercial Company, and Monaco Investment Company.

In 1963, Fink became a partner in all four partnerships. In 1969 or 1970 Kronish withdrew from all the partnerships and died a year later.[2] Borinstein died in 1974 and, thereafter, his wife, Pearl, assumed his interests as trustee of various trusts for the benefit of their daughter Joan.

In late 1976, Kajima became interested in acquiring property suitable for the development of high quality single-family homes. Arthur Strouse (Strouse), the real estate manager for Kajima, worked with Henry E. Blaesing (Blaesing), a licensed real estate broker, looking for property in the Palos Verdes area. In October 1976, in the course of their search, Strouse and Blaesing came in contact with Paul Walker (Walker), a licensed real estate broker, who had had prior dealings with PVM and knew Owens. After Walker discovered that Strouse was looking for large parcels of land on the Palos Verdes peninsula on Kajima's behalf, he suggested several parcels, including two that he believed were owned by PVM. He telephoned Owens to ascertain if the two parcels were still available. Owens told Walker to show the 57-acre parcel which is the subject of this lawsuit, to "pursue the sale," and "keep him informed."

John Sogorka (Sogorka), a salesman for Walker, showed the subject property to Strouse and Blaesing. Blaesing testified that he was told that the property was owned by a partnership called PVM. Owens', Fink's and Borinstein's names were mentioned in connection with the property, and the asking price for the property was stated to be $2 million.

In November 1976, Kajima made two offers on the property. Each of the offers was hand-delivered to both Owens and Fink by Sogorka. After Owens read the first Kajima offer, he told Sogorka, "Al Fink will be handling this from now on; just keep me apprised of what's going on." Both of Kajima's initial offers were rejected. Fink told Sogorka that he had had a meeting with Owens about the second offer, that the proposed purchase price was too low, that they had suggested some changes in the offer, and that Owens did not like some of the paragraphs and had crossed them out completely. From November 1976, through February 1977, Sogorka continued to try to put a package together to effect a sale of the property.

On March 2, 1977, a meeting was arranged to discuss the possible sale of the subject property to Kajima. The meeting was held at the Kirkeby Center, and the following individuals were present: Joan and Fink, who were present on behalf of the proposed seller, Strouse and Hirotake Oribe, vice president of Ka-

---

[2]There is a dispute as to the ownership of Kronish's interest in the partnership.

jima, who were present on behalf of the proposed buyer, Walker, Sogorka and Blaesing. Walker had phoned Owens and invited him to be present at the March 2 meeting. Walker testified that Owens asked if Fink was going to attend the meeting, and when he told Owens that Fink had indicated he would attend, Owens "said that Al was going, then he didn't intend to be there." No agreement was reached at the March 2 meeting.

Another meeting to discuss the sale was set for March 25, 1977, at the offices of Kindel & Anderson. Prior to the meeting, Fink phoned Owens and told him about the meeting and "that we were possibly close to selling the property." Fink testified, "And he [Owens] asked me to then attend the meeting, make the best possible deal we could for ourselves." Walker also telephoned Owens prior to the March 25 meeting and invited him to attend. Walker testified, "Mr. Owens told me he would not be in attendance since Al [Fink] was there and he spoke for the two of them."

At the March 25 meeting Kajima was represented by Oribe, Strouse, Blaesing, and its recently hired attorneys, Al Augustine (Augustine) and Hugh Boss (Boss) of Kindel & Anderson. The seller was represented by Fink, Joan, and the selling partnership's attorney, Allan Sigel (Sigel). Walker and Sogorka also attended. At this meeting the parties reached an oral agreement on the price, terms and conditions of a sale.[3]

During the course of the March 25 meeting, Fink stated, in response to a question concerning his authority to act, that he was authorized to negotiate the sale on behalf of the partnership.

The next working day after March 25, Joan and Fink placed a telephone call to Owens. Joan and Fink were each on extension phones. Fink explained to Owens the terms of the sale which had been agreed upon at the March 25 meeting. Joan testified that "Mr. Owens in a very enthusiastic way said he thought it was a great deal and that he was very, very pleased with everything that had been negotiated. And his words were something 'let's proceed' or 'let's go ahead'—was very enthusiastic about it." Fink replied, "Fine; we'll proceed," or "We'll go ahead and have the papers drawn up." Joan testified

---

[3]The trial court made the following finding of fact: "They agreed upon a purchase price of $1,970,000.00, and they decided that escrow would be opened with a $15,000.00 deposit, followed by a forty-five-day period in which Kajima could elect not to go forward with the sale if the preliminary title report disclosed the title to the land to be in a condition which interfered with Kajima's desire to develop the property. At the end of the forty-five-day period, another $15,000.00 payment was to be made, and similar payments were to be made on a monthly basis until the close of escrow six months later. At the time of closing, the balance of the purchase price was to be paid. It was further agreed that Boss and Sigel would draft the language to be used in the final sale document, and Fink urged them to draft the agreement as soon as possible. The parties agreed to meet as soon as the agreement was drafted in order to open escrow."

that she understood the terms and conditions and had indicated to Fink that she approved of the sale. With respect to the telephone call to Owens, Fink testified, "Mr. Owens was—seemed satisfied and approved the terms, conditions, price, and, overall, over the telephone seemed happy about it." Fink also talked with Pearl after the March 25 meeting. He discussed the agreed-upon price, terms and conditions of sale with her. He told her he approved of the transaction. Fink testified that Pearl said, "[s]he approved of the proposal only if Mr. Owens had also approved," and that he told her that Owens had approved the sale.

On April 1, 1977, a meeting was held at Title Insurance & Trust Company to open escrow and to sign the documents which had been prepared by Boss of Kindel & Anderson. Boss had worked with Sigel, MLH's attorney, in the drafting of the papers.

Some time after the March 25 meeting and before the April 1 meeting, Sogorka hand-delivered a document to Owens. He testified, "It was a rather lengthy document. All I did was hand it to him and . . . I said, 'This is a meeting coming up.' And he said, 'I was aware of that, I won't be there, . . .' but that Al Fink would be handling it and just keep him aware of what's going on."

Prior to the April 1 meeting, Fink called Owens to tell him that the meeting would be at Title Insurance & Trust Company and that the documents were ready to be signed. Fink testified that Owens ". . . told me that he didn't have the time that day, and couldn't be there; however, if I would pick up the papers and bring them back, he would sign them." Owens also told Fink to go to the meeting and see that escrow was opened and that Kajima deposited the money in escrow.

Pearl broke her leg on March 31, and, as a result, she and her daughter, Joan, were unable to attend the April 1 meeting.

Escrow was opened at the meeting on April 1, 1977. Kajima was represented by Taro Ikeda, its general manager in the United States, and by Oribe, Strouse, Blaesing and Boss. The sellers were represented by Fink and Sigel. Walker and Sogorka were also present. Boss testified that prior to the April 1 meeting he had been advised that three partners of the selling partnership would attend the meeting. When the meeting commenced, Boss inquired as to the whereabouts of the other two partners. He was advised that they would not be able to attend the meeting. Boss testified that he asked, "given the fact that there was no—only one partner, Mr. Fink, present at the meeting, whether he was authorized to sign for and bind the partnership." Both Fink and Sigel responded that Fink was authorized. Various other witnesses who attended the April 1 meeting con-

firmed the substance of this colloquy concerning Fink's authority to sign the sale's agreement on behalf of the selling partnership. However, there was no general agreement as to who precisely asked the question respecting Fink's authority.

Fink signed the April 1 agreement for conveyance of real property and escrow instructions on behalf of the selling partnership. Ikeda signed the agreement as the authorized representative of Kajima. Kajima paid $15,000 into escrow at the April 1 meeting, and the escrow was opened.

On the evening of April 1, Fink took a signed original of the agreement to Pearl's house.[4] Joan was with Pearl. Pearl signed the agreement. Fink brought the signed document to Sigel.

Fink first learned that Owens did not want the sale to go forward on April 13 or 14, 1977. Pearl testified that she was surprised and upset when she learned that Owens did not want to go forward with the sale.

The preliminary title report which was issued on April 13, 1977, revealed that the subject property was owned by MLH, not PVM, as all the parties had originally believed.[5]

Kajima tendered the $15,000 monthly payments called for under the agreement from May 15, 1977, through November 15, 1977. These checks were accepted but not cashed by Fink on behalf of the selling partnership. MLH refused to convey title to the subject property on December 10, 1977, as required under the April 1 agreement.

## DISCUSSION

The seminal issue in this appeal is whether Fink's signature alone was sufficient to bind MLH to the terms of the April 1 agreement. The resolution of that question depends upon the conclusion we reach regarding Fink's authority to

---

[4]Apparently Fink and Ikeda signed more than one copy of the agreement at the April 1 meeting.

[5]The mistaken reference to PVM as the selling partnership instead of MLH constitutes appropriate grounds for reformation. Civil Code section 3399 provides, in pertinent part, "When, through . . . a mutual mistake of the parties . . . a written contract does not truly express the intention of the parties, it may be revised. . . ." It is clear that all parties to the April 1 agreement intended the contract to include the correct name of the selling entity, and that all of them had in mind the identical 57-acre parcel of property. "Reformation of a written instrument will be decreed when the words that it contains do not correctly express the meaning that the parties agreed upon . . . ." (3 Corbin on Contracts, § 614, p. 713 et seq.; see generally 1 Witkin, Summary of Cal. Law (8th ed. 1973) § 304, p. 255; 13 Williston 3d (1970) § 1547, pp. 111-119; Rest., Contracts, § 504 et seq.)

act for the partnership. The trial court found that Fink had actual authority to bind the partnership under the terms of paragraph XIV(A) of the partnership agreement.[6] The court also found that Fink had apparent, or ostensible authority under Corporations Code section 15009, subdivision (1) and that "[t]he sellers are estopped to deny that Fink had authority to sell the land to Kajima."

In our view of the matter, the provisions of Corporations Code section 15009, subdivision (1) are dispositive of the issue of Fink's authority to bind the partnership, and we will discuss only those additional issues raised by the parties which are necessary for a complete resolution of this appeal.

Corporations Code section 15009 provides in pertinent part as follows:

"(1) *Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including the execution in the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership of which he is a member binds the partnership,* unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing has knowledge of the fact that he has no such authority.

"(2) An act of a partner which is not apparently for carrying on the business of the partnership in the usual way does not bind the partnership unless authorized by the other partners.

"(3) Unless authorized by the other partners or unless they have abandoned the business, one or more but less than all the partners have no authority to:

"(a) Assign the partnership property in trust for creditors or on the assignee's promise to pay the debts of the partnership.

"(b) Dispose of the good will of the business.

"(c) Do any other act which would make it impossible to carry on the ordinary business of a partnership. . . ." (Italics added.)[7]

---

[6] Paragraph XIV(A) of the MLH partnership agreement provided, "Sales of all or any portion of the partnership real property may be effected by the decision of partners having a majority in interest of the profits of the partnership."

[7] California Corporations Code section 15009 codifies section 9 of the Uniform Partnership Act. Both the California and the uniform versions of this statute appear under the heading, "Relations of Partners to Persons Dealing with the Partnership." The heading and the content of the section suggest a purpose to protect potential creditors and others dealing with a partnership.

The Supreme Court in analyzing section 15009 in *Ellis* v. *Mihelis* (1963) 60 Cal.2d 206, at pages 217-218 [32 Cal.Rptr. 415, 384 P.2d 7], stated: "[¶] These provisions distinguish between acts of a partner which bind the partnership because of his status as a partner without any express authority being required and acts binding on the partnership only after express authorization by all partners. Under the express terms of subdivision (1) of the section all acts of a partner which are apparently within the usual course of the particular business bind the partnership. The effect of the provision is that the status of a partner, without more, serves as a complete authority with respect to such acts, obviating the necessity of any express authority, either oral or written, from the other members of the firm.

"*It necessarily follows that insofar as a partner limits his conduct to matters apparently within the partnership business, he can bind the other partners without obtaining their written consent.* Subdivision (2), however, provides that there must be express authority for acts of a partner which do not appear to be in the usual course of the business. . . .

"The distinction made by subdivisions (1) and (2) between acts which are apparently in the usual course of business and those which are not is in accord with the cases in other jurisdictions which have held, without mention of any statutory requirement for written authority of an agent, that *a contract executed by one partner alone to sell partnership real estate is binding on the other partners provided the partnership is in the business of buying or selling real estate and the property covered by the contract is part of the stock held for sale.*" (Italics added.)

Corporations Code section 15010 provides in part: "Where title to real property is in the partnership name, any partner may convey title to such property by a conveyance executed in the partnership name; but the partnership may recover such property unless the partner's act binds the partnership under the provisions of paragraph (1) of Section 15009, . . ."

In the case before us, Fink's signature alone was sufficient to bind the partnership if the sale of the subject property was an act "for apparently carrying on in the usual way the business of the partnership."

"The apparent scope of the partnership business depends primarily on the conduct of the partnership and its partners and what they cause third persons to believe about the authority of the partners. Ostensible agency or acts within the scope of the partnership business are presumed 'where the business done by the supposed agent, so far as open to the observation of third parties, is consistent with the existence of an agency, and where, as to the transaction in question, the third party was justified in believing that an agency existed.' [Citations.]"

(*Blackmon* v. *Hale* (1970) 1 Cal.3d 548, 557 [83 Cal.Rptr. 194, 463 P.2d 418].)

The trial court found that "[t]he sale of the land to Kajima was apparently in the ordinary course of the selling partnership's business." This finding was supported by the evidence. The sole purpose of the MLH partnership was the holding and sale of the subject property. The partnership agreement provided: "The general character and nature of business of this partnership shall be the holding of the real property described in Exhibit 'A' [of which the 57-acre subject property was a part] with the view to the appreciation in value thereof and *the ultimate sale of said real property* in its unimproved state." (Italics added.) The only dealings which Kajima and the people who represented it had with MLH concerned the sale of the subject property. There is no indication in the record that MLH had any business other than the sale of the subject property.

The trial court found that: "Fink was the only partner who ever attended meetings with representatives of Kajima regarding this transaction up to and including April 1, 1977. Fink conducted the negotiations on behalf of the sellers.

"In the context of the negotiations for the sale of the land, Fink's role as sale negotiator for the sellers, and Owens' statements to Walker and Sogorka to the effect that Fink would handle the deal on behalf of the sellers, which were reported to Kajima, were two factors in reasonably leading Kajima to believe that Fink had authority to sell the land."

The conduct of the partnership and its partners in this case was sufficient to sustain the findings that the partnership was in the business of selling property and that Fink, a partner, was authorized to act for the partnership.

Appellants argue that sale of the subject property cannot be considered to be within the apparent scope of the partnership business because sale of said property would make it impossible to carry on the partnership business.

Section 15009, subdivision (3) specifies certain acts which are not within the scope of the usual course of business. It provides: "Unless authorized by the other partners or unless they have abandoned the business, one or more but less than all the partners have no authority to: . . . (b) Dispose of the good will of the business. (c) Do any other act which would make it impossible to carry on the ordinary business of a partnership."

Historically, partnerships were divided into two types, commercial or trading partnerships and noncommercial or nontrading partnerships. Though this distinction has been rejected in California, it is clear that a nontrading partner-

ship (such as MLH) has no good will to dispose of. In the 20 years prior to the transaction at issue, MLH had never engaged in commerce. MLH had no customers, its name was not known to the public, and it had no value in excess of the value of its sole asset. Therefore, Fink could not rightly be said to have exceeded his authority under section 15009, subdivision (3) by disposing of the good will of MLH.

The trading/nontrading distinction is also valuable in considering whether Fink exceeded his statutory authority by making it impossible to carry on the ordinary business of the partnership. A number of reported decisions, including *Petrikis* v. *Hanges* (1952) 111 Cal.App.2d 734 [245 P.2d 39], cited by appellants, hold that the sale of a partnership's only asset is beyond the scope of usual partnership business and thus cannot be effected by a single partner. In *Petrikis,* the seller of real property, Mr. Petrikis, sold the partnership's only asset, a cocktail lounge, without written authority from his partners. The Court of Appeal held that Petrikis had not bound the partnership because he had acted beyond the scope of usual business in selling the partnership's only asset. *Petrikis* is distinguishable from the present case in that *Petrikis* involved a trading partnership. Petrikis' partnership was in the business of running a bar, not the business of holding a bar in anticipation of its eventual sale. (See also, *Ellis* v. *Mihelis, supra,* 60 Cal.2d 206.) In the case at bench, MLH had a singular purpose. It existed solely to hold and sell a piece of real property. The business of MLH was selling its land. Thus, the sale was in the ordinary course of MLH's business.

Appellants contend that Kajima had knowledge that Fink lacked authority to bind the partnership with respect to the sale of the subject property. As noted, under the terms of Corporations Code section 15009, subdivision (1), such knowledge on the part of Kajima would destroy the binding effect of Fink's actions based on his status as a partner. Appellants base their claim of knowledge on the fact that MLH had recorded a statement of partnership and designation of agent pursuant to the provisions of Corporations Code section 15010.5. The statement of partnership, as amended, after setting forth all the members of the partnership, contained the following language: "Two of the persons hereinafter mentioned shall be authorized to execute and deliver for and on behalf of the partnership, any and all agreements, . . . and any other documents necessary to be executed for and on behalf of the partnership. One such person shall be either Manuel A. Borinstein or Pearl A. Borinstein, and the other such person shall be either Seymour Owens, Herbert Kronish or Albert Fink." It is appellants' position that the inclusion of the above-quoted language in the recorded statement of partnership was sufficient to put Kajima on constructive notice of the alleged limitation contained therein with respect to the authority of one partner to bind the partnership.

Appellants' contention is without merit for the following reasons: First, neither Corporations Code section 15010.5 (which permits the recording of statements of partnership) nor Government Code section 27280 (which permits the recording of instruments affecting title to or possession of real property) provides for the recording of an authority-restricting clause such as was done by MLH in this case. It is our belief that section 15010.5 is designed to protect potential partnership creditors, not to give constructive notice of private agreements among partners that seek to restrict individual partners' authority. "It is settled that an instrument which is recorded but which is not authorized to be recorded and given constructive notice effect by statute does not impart constructive notice to subsequent purchasers." (*Brown* v. *Johnson* (1979) 98 Cal. App.3d 844, 849 [159 Cal.Rptr. 675]; *Black* v. *Solano Co.* (1931) 114 Cal. App. 170, 173 [299 P. 843].)

Similarly, appellants cannot successfully contend that the restriction on authority was recorded pursuant to Government Code section 27280. Here, again, *Brown* v. *Johnson, supra,* 98 Cal.App.3d 844, is instructive. In *Brown* the owner of real property conveyed the property in exchange for unsecured promissory notes. The seller subsequently recorded a notice of vendor's lien, though no statute provides for recording such a notice. In holding that the recording of the vendor's lien did not constitute constructive notice of the seller's interest, the court said, "[T]he sole issue is whether the recordation of the notice of vendor's lien gave constructive notice to the defendants of plaintiff's claimed interest in the property. That issue depends upon whether the instrument in question is an instrument which some statute authorizes or permits to be recorded and which has the effect of constructive notice." The court went on to say, "The instruments which will give constructive notice . . . are those instruments by which a conveyance is made. It is the instrument itself which is the operative element of the transaction. Self-serving statements recorded in a chain of title are not instruments which are operative in transferring or creating a right or title and thus do not provide constructive notice to subsequent purchasers." (*Brown* v. *Johnson, supra,* at pp. 848-850.) The clause in the MLH statement of partnership which sought to limit an individual partner's authority did not purport to make a conveyance, or to affect possession or title. That clause was a mere self-serving statement which had no constructive notice effect.

Second, even assuming that MLH had a right to record its limitation on partner authority and that the recording gave rise to constructive notice, "knowledge" as used in section 15009, subdivision (1) does not include constructive notice. The term "knowledge" as used in section 15009 is defined in Corporations Code section 15003 as follows: "A person has 'knowledge' of a fact within the meaning of this act not only when he has actual knowledge thereof,

but also when he has knowledge of such other facts as in the circumstances shows bad faith."

The sole purpose of section 15010.5 is to create "a conclusive presumption of the identity of the partners in favor of any bona fide purchaser for value of the partnership's real property in the county where the statement is recorded, unless a verified and acknowledged statement to the contrary has also been recorded." (Advising Cal. Partnerships (Cont.Ed.Bar 1975) pp. 72-73.) These provisions assure grantees, secured lenders, and title insurers of the authority of the persons signing a real property conveyance on the partnership's behalf. However, as was said by the California Supreme Court in *Blackmon* v. *Hale, supra,* 1 Cal.3d 548 at page 558: "Sound public policy dictates that a partnership must inform those who deal with its members in the course of the partnership's business of any special restrictions on a particular partner's authority. A person dealing with a partnership usually is in no position to know of special agreements between the partners and thus cannot be charged with knowledge of such agreements absent specific notice. [Citation.]"

Clearly, constructive notice is not encompassed within the statutory definition of "knowledge," as set forth in Corporations Code section 15003. Moreover, policy considerations preclude expanding the definition of knowledge to include constructive notice.

The evidence is sufficient to support the trial court's findings with respect to Fink's agency and the findings and conclusions of law support the trial court's determination that specific performance of the April 1 agreement is appropriate.[8]

### DISCOVERY MOTION

■ Appellant Owens contends that the trial court erred by upholding Kajima's claims of attorney-client privilege (Evid. Code, § 954) and work product privilege (Code Civ. Proc., § 2016, subd. (b)) to matters in Kajima's attorneys' files other than things that Kajima voluntarily produced at trial.

The documents introduced by Kajima which would have otherwise been protected by the attorney-client or attorney work product privileges included a series of working drafts of the April 1 agreement, Kindel & Anderson's notes

---

[8]Appellant Owens contends that a memo written in the form of a minute order and placed in the file by Commissioner Gorenfeld in connection with his rulings prior to trial denying Owen's motion for summary judgment might have improperly influenced the trial court's decision. Owens claims that as a result the judgment should be reversed. Suffice it to say that reversal cannot be predicated upon such speculation. Commissioner Gorenfeld was not the trial judge. Appellants received a full and fair trial on the merits, and there is nothing to show that the trial court was influenced in any way by Commissioner Gorenfeld's memo.

of conversations with the partners and their lawyers made contemporaneously with those conversations, telexes from Kajima giving instructions to Kindel & Anderson to complete the sale, and some handwritten notes by Boss and Augustine of Kindel & Anderson concerning information that the firm received from Owens' partners and their lawyers. Kajima states: "All documents relevant to any conversation or communication about which a witness testified that could otherwise have been protected by the claim of privilege were disclosed. . . ." The trial court ordered such disclosure, and Owens does not dispute that such disclosure took place. Rather, Owens takes the position that such voluntary revelations of lawyer-client communications and attorney work product constituted a waiver of those privileges as to all other such communications and work product having anything to do with the subject matter of the lawsuit.

The issue raised by Owens appears to be whether once Kajima's attorneys testified at trial respecting some of the occurrences prior to and after the signing of the alleged sale agreement, and after Kajima had placed in evidence certain documents from its attorney's files concerning the case, it had waived the attorney-client privilege and the work product privilege as to all matters contained in Kajima's attorneys' files pertaining to the subject matter of this lawsuit.

Evidence Code section 912, subdivision (a) provides in pertinent part, "Except as otherwise provided in this section, the right of any person to claim a privilege provided by Section 954 (lawyer-client privilege) . . . is waived with respect to a communication protected by such privilege if any holder of the privilege, without coercion, has disclosed a significant part of the communication or has consented to such disclosure made by anyone." (Italics added.)

The trial court ruled that a waiver under Evidence Code section 912 relates to the particular communication which has been revealed and not to all communications concerning the subject matter of the lawsuit. In arguing that the trial court erred in so restricting its interpretation of Evidence Code section 912, Owens relies on Jones v. Superior Court (1981) 119 Cal.App.3d 534 [174 Cal.Rptr. 148]. In Jones, a witness, the mother of the plaintiff, disclosed, during a deposition, conversations with her physician regarding her pregnancy and that fact that she had ingested DES. The question considered by the court was whether the mother had waived the physician-patient privilege, and if so, the extent of the waiver. The court stated at pages 546-547: "Petitioner's privilege is, however, subject to Evidence Code section 912, which provides (in subd. (a)) that the right of a person to claim the privilege 'is waived with respect to a communication protected by such privilege if any holder of the privilege, without coercion, has disclosed a significant part of the communication.' By testifying freely that she ingested DES, and as to certain of the circumstances in which she did so, petitioner has disclosed a 'significant part' of her communica-

tions with physicians on that subject, and on the inextricably related subject of her pregnancy with plaintiff. Thus, she has waived her statutory privilege as to these matters.

"It does not follow that petitioner, by disclosing portions of communications relating to her consumption of DES and her pregnancy with plaintiff, has waived her privilege as to all otherwise protected communications during her lifetime. (Fn. omitted.) Even the waiver which follows upon tender of a medical issue by a party to the litigation does not extend that far: 'the scope of the inquiry permitted depends upon the nature of the injuries which the patient-litigant himself has brought before the court.' [Citations.]"

Here, the trial court carefully examined the documents put in evidence by Kajima and concluded that Kajima had not disclosed any "significant part" of the communications that Owen sought to discover, thus not triggering the waiver provision contained in Evidence Code section 912, subdivision (a). Our review of the record corroborates the correctness of the trial court's ruling. Moreover, the record indicates that no showing was ever made by Owens' trial counsel that any of the documents sought to be inspected had any relevancy to any of the *issues* framed by the pleadings or to the credibility of a witness or a hearsay declarant. There is a time and a place for discovery motions relevant to *subject matter* only. It is not during a trial.

### CROSS-APPEAL

■ Kajima claims that the trial court erred when it dismissed Kajima's tort claim against Owens for conspiracy to interfere with contract.

The trial court made a finding which states, "The sellers' breach was due in large part to the conduct of Owens. Both before and after April 1, 1977, Owens, along with Ray Polverini, Sam Perricone, and Vernon Taylor, was planning to purchase the subject property. Notwithstanding Owens' consent to the sale to Kajima before April 1 and his directions to Fink to sign the April 1 agreement and to open escrow on behalf of the sellers, Owens, Polverini, Perricone, and Taylor, after April 1, 1977, formed a partnership, P.V. Crest Development, and submitted an offer on its behalf to purchase the Subject Property. Owens and the other partners in P.V. Crest Development intended thereby to prevent the sale to Kajima, and their efforts contributed to the sellers' breach of the April 1 agreement."

Pursuant to stipulation of the parties, Kajima's tort causes of action were to be tried after their cause of action for specific performance. The trial court, however, precluded Kajima from proving any damage suffered as a result of the alleged conspiracy to induce breach of contract alleged against Owens, hav-

ing concluded that "the element of damages that are alleged, in the Court's view, are all included within the remedy of specific performance; in essence, the dismissal of those other [tort] counts, which the Court indicated on the record, has in effect been preordained by the election of remedies to seek specific performance."

In *Duff* v. *Engelberg* (1965) 237 Cal.App.2d 505 [47 Cal.Rptr. 114], the court held that a vendee under an executory contract to purchase can obtain specific performance of the contract as well as compensatory and exemplary damages against a third party who induced the vendor not to go ahead with the sale.

Owens argues that the law as expressed in *Duff* v. *Engelberg, supra,* is not applicable in this case because Owens was not an unrelated third person, but a partner in the selling partnership. Owens relies upon *Dryden* v. *Tri-Valley Growers* (1977) 65 Cal.App.3d 990, 998 [135 Cal.Rptr. 720], which stands for the proposition that a cause of action for the tort of wrongful interference with contractual relations will not lie against a party to the contract. That rule is, however, not applicable in the case of a cause of action for conspiracy to induce breach of contract. As was said by this court in *Olivet* v. *Frischling* (1980) 104 Cal.App.3d 831, at page 838 [164 Cal.Rptr. 87], "We are, however, not only faced with an underlying wrong, but confront an independent action for civil conspiracy. The distinction is crucial, for it is accepted, at least in California, that an action for conspiracy to induce a breach of contract will in fact lie against a party to the agreement, regardless of the fact that the party would not be directly liable for its breach as such. (*Wise* [v. *Southern Pacific Co.* (1963)] 223 Cal.App.2d [50,] at p. 71 [35 Cal.Rptr. 652].) In so holding, the court observed that to hold a contracting party liable in tort not only comports with the general principle that all who are involved in a common scheme are jointly and severally responsible for the ensuing wrong, but also reenforces good morals. [Citations.]" (See also, *Owens* v. *Foundation for Ocean Research* (1980) 107 Cal.App.3d 179, 185 [165 Cal.Rptr. 571].)

Owens' contentions that Kajima has failed to prove damages directly attributable to the alleged conspiracy are meritless in light of the fact that the trial court dismissed Kajima's fourth cause of action prior to trial on it.

The judgment is reversed insofar as it dismissed the fourth cause of action of Kajima's cross-complaint for damages for conspiracy to interfere with economic relations. In all other respects, the judgment is affirmed. Respondent and cross-complainant Kajima to recover costs and reasonable attorneys' fees on ap-

peal. The trial court is directed to determine and award reasonable attorneys' fees in addition to usual costs on appeal.

Ashby, J., and Hastings, J., concurred.

A petition for a rehearing was denied May 31, 1983, and the petition of plaintiff and appellant for a hearing by the Supreme Court was denied August 10, 1983. Mosk, J., was of the opinion that the petition should be granted.