729 P.2d 310

William JOLLY; and Jolly Realty and Investment Co., an Arizona corporation, Plaintiffs-Appellants,

v.

KENT REALTY, INC., a corporation; Rosemary Kent, Trustee under the Kent Family Trust; W.R. Kent, an unmarried man as his sole and separate property, Vernon F. Edwards, an unmarried man as his sole and separate property; Cyril E. Tammage, and Janie C. Tammage, husband and wife; and Janus Poppe and Karen Poppe, husband and wife, Defendants-Appellees.

No. 1 CA–CIV 8386.

Court of Appeals of Arizona, Division 1, Department D.

June 19, 1986.

William F. Behrens, Phoenix, for plaintiffs-appellants.

Sternberg, Sternberg & Rubin by Mitchell Reichman, Phoenix, for defendants-appellees.

BROOKS, Judge.

In this case the plaintiffs William Jolly and Jolly Realty and Investment Co. appeal the trial court's judgment dismissing their complaint for specific performance of an alleged agreement to sell real property and for recovery of a real estate broker's commission. Because matters outside the pleadings were presented to and not excluded by the trial court, we view the judgment as one of summary judgment pursuant to Rule 56, Arizona Rules of Civil Procedure. *See* Rule 12(b), Arizona Rules of Civil Procedure. The appeal presents for our consideration the following issues: (1) whether the trial court erred in holding that the documents that formed the alleged

contract were improperly signed and did not satisfy the statute of frauds, A.R.S. § 44–101, and (2) whether the trial court properly rendered judgment for defendants on the principle that one co-tenant may not bind other co-tenants under the circumstances of this case.

The record reveals the following facts. Defendants acquired ownership of an apartment complex in Phoenix through an agreement for the sale of real property executed in January of 1979. Under the sale agreement the defendants each received undivided interests in the property in varying percentages.[1] At or around the time the sale agreement was executed, defendants entered into an agreement among themselves entitled "Joint Venture Agreement." This agreement recited that it was "one between co-investors (joint venturers) and *not* between partners." Each co-investor was to own a percentage of the joint venture equal to his or her percentage ownership in the property being purchased. Under the heading "Objectives" the agreement provided:

> The objective of the joint venture is to acquire, hold and manage, sell or exchange apartment investments to secure maximum appreciation, tax shelter, income and return for monies invested consistent with good business practices and changing economic conditions.

The agreement provided that if an investor desired to sell his or her share of the investment, the remaining investors would have priority in purchasing it. The agreement further contemplated that the net income from the investment, after any necessary contributions to a $5,000 contingency reserve account and payment of current expenses, would be distributed to the joint venturers according to their percentage of ownership. The agreement also provided that defendant Kent Realty Company would manage the property for the joint venture in exchange for 5% of the gross income from the investment. Under the

1. The percentage interests assigned to each defendant were as follows: Kent Realty, Inc.—35%; Rosemary Manion—17.5%; W.R. Kent—15%; Vernon F. Edwards—12.5%; Cyril E. and Janie C. Tammage—10%; Janus and Karen Poppe—10%.

heading of "Investment Decisions," the agreement further provided:

> Decisions affecting the future worth of the investment, expenditures other than normal expenses and such other decisions as is deemed important by any of the joint venturers shall be referred to the entire group for consideration. Decisions will then be made with each investor casting the number of votes equal to his percentage of ownership. All decisions made in this manner must be supported by a 51% or more majority vote.

The agreement also required the joint venturers to contribute any additional funds "required for any purpose in furtherance of the joint venture that are in excess of the initial capital contributions by the investors and the amount accumulated in the CONTINGENCY RESERVES" in the same proportions as their percentages of ownership. The agreement also provided that death of any investor would not dissolve the joint venture, and that the joint venture would continue "without interruption with the executor or administrator of the decedent's estate replacing the decedent."

In January and February of 1984, plaintiff William Jolly and defendant William Kent, nominally acting for "Kent Realty, Inc., etc.," engaged in negotiations whereby Jolly sought to buy the joint venture property on behalf of "Sunny Hills Assoc., a General Partnership to be formed and/or Nominees or as[signees]." Jeffrey Jacobs, a real estate broker, participated in the negotiations on Jolly's behalf. Jolly's affidavit stated in part:

> Affiant has likewise ascertained from Mr. Jeff Jacobs, one of the brokers in connection with the transaction, that Mr. Kent likewise told him that he (Mr. Kent) and his co-tenants were partners; that he and his ex-wife (Rosemary Kent) together control 65% of the partnership; that 51% is all they need; that hence he (Mr. Kent) did not need the other partners'

approval; and that they have a partnership agreement.

In his own affidavit Kent stated that he always referred to his "co-tenants-in-common" as "partners," and that when he used the term "partner" he was referring to his co-investors in the subject property. He stated:

> Those references in which it is alleged that I used the term "partnership" and "partnership agreement" I was referring to the Joint Venture Agreement attached hereto. There is no other written agreement between the co-investors for the subject property.

On January 24, 1984, Jolly submitted to Kent a written offer to buy the property for $900,000. The offer was submitted on a printed form "Real Estate Purchase Contract and Receipt for Deposit,"[2] and included a typewritten addendum with additional provisions. Kent did not execute this document. Instead, on January 25, 1984 he submitted a written counteroffer on a printed form "Supplement to Real Estate Purchase and Receipt for Deposit."[3] Kent's signature on the "Supplement" appeared on a signature line for "Seller" under the printed words: "The undersigned acknowledge receipt of a copy hereof and authorize Broker to deliver a signed copy to Buyer."

Jolly did not execute the "Supplement" of January 25, 1984, but rather submitted to Kent a counteroffer on another "Supplement" form dated February 1, 1984. Jolly executed this counteroffer on a signature line for "Buyer" under the printed words: "The undersigned acknowledge receipt of a copy hereof and authorize Broker to deliver a signed copy to Seller."

Kent did not execute this counteroffer, and instead submitted another counteroffer to Jolly on a "Supplement" form dated February 2, 1984. The handwritten portion of this document stated in part as follows:

2. This form is identified as "Form No. 6" of the "Arizona Association of REALTORS," copyright 1983.

3. This form is identified as "Form No. 2" of the "Arizona Association of REALTORS," copyright 1976, 1979, 1980 and 1982.

Let this serve as a Counter Offer to the Counter Offer by the buyer dated February 1, 1984 which was a Counter Offer to the Counter Offer signed and dated by the Seller, January 25, 1984 which was a Counter Offer to the Real Estate Purchase Contract dated January 24, 1984.

\* \* \* \* \* \*

This Counteroffer must be accepted by Saturday, February 4, 1984, 5 p.m. MST. All other terms and conditions of the Real Estate Purchase Contract, including the addendum, and its counteroffers shall remain in full force and effect.

As on Kent's earlier counteroffer of January 25, 1984, Kent's signature appeared under printed language stating: "The undersigned acknowledge receipt of a copy hereof and authorize Broker to deliver a signed copy to Buyer."

Immediately below Kent's signature, the "Supplement" form contained printed language which stated as follows:

Above modifications or additions are approved and accepted.

The undersigned acknowledge receipt of a copy hereof and authorize Broker to deliver a signed copy to Seller.

Jolly signed in the space indicated for "Buyer" under this language and added the date of February 3, 1984. The "Supplement" form also included the following provision under the "Buyer" signature line:

FINAL ACCEPTANCE BY SELLER:

Dated _____

The above counteroffer by buyer(s) is approved and accepted. The undersigned acknowledge receipt of a copy hereof and authorize Broker to deliver a copy to Buyer.

X _____ X _____
　　　Seller　　　　　　　Seller

This provision was left blank.

After Jolly signed the "Supplement" form on February 3, 1984, Kent signed and delivered to Jolly a handwritten sheet containing the "rent roll" for the apartment complex and stating:

Please permit Bill Jolly or Jeff Jacobs to check old utility bills for my property located at 927 W. Cheryl and 10,001–10,033 Phoenix.

On February 8, 1984 Jolly opened an escrow at Western Title Agency. On that same day, Jolly, Kent and two others made a partial inspection of the apartment complex. On February 13, 1984, Kent told Jolly over the telephone that "said realty was in a partnership and that he needed to obtain the partners' approval for the sale." According to plaintiffs' complaint, defendant Kent Realty, Inc. later halted Jolly's performance under the alleged contract, and despite Jolly's demands, failed and refused to perform.

Plaintiffs commenced the instant action on March 22, 1984. Defendants moved to dismiss. Both sides later submitted affidavits and documents in support of their positions. By minute entry of January 7, 1985, the trial court ruled:

There being no sale documents properly signed by the Plaintiff, Defendants' Motion to Dismiss is granted.

Plaintiffs thereafter moved for reconsideration. The trial court denied that motion in a minute entry ruling dated March 1, 1985, stating:

The Court has indeed reconsidered and now reaffirms the prior dismissal of this matter for the dual reasons that the documents in question were improperly signed and thus do not satisfy the Statute of Frauds and for the further reason that one co-tenant may not bind other co-tenants under these circumstances.

A formal order and judgment of dismissal with prejudice was entered on March 1, 1985, and plaintiffs brought this appeal. We have jurisdiction pursuant to A.R.S. § 12–2101(B).

■ Plaintiffs first argue that the trial court erred in holding as a matter of law that there was no sale document properly signed by plaintiff Jolly. Defendants do not respond directly to this argument, and instead contend that the trial court's ruling must be affirmed because defendant Kent Realty, Inc. never signed the "Final Acceptance by Seller" space on the "Supplement" of February 2, 1984, and that no

enforceable contract was ever formed. In our opinion the trial court's ruling was wrong on either theory. A.R.S. § 44–101 provides in pertinent part:

No action shall be brought in any court in the following cases unless the promise or agreement upon which the action is brought, or some memorandum thereof, is in writing and signed by the party to be charged, or by some person by him thereunto lawfully authorized:

\*   \*   \*   \*   \*   \*

6. Upon an agreement for leasing for a longer period than one year, or for the sale of real property or an interest therein. Such agreement, if made by an agent of the party sought to be charged, is invalid unless the authority of the agent is in writing, subscribed by the party sought to be charged.

In *Shreeve v. Greer,* 65 Ariz. 35, 173 P.2d 641 (1946), Shreeve owned real property which Melvin Greer and Byron Heap and their wives sought to purchase. The writing in question was a contract in the form of a receipt which only Shreeve and Byron Heap signed. Shreeve later refused to sell. Appealing from a decree of specific performance rendered by the trial court, Shreeve argued in the Arizona Supreme Court that the writing was inadequate under the predecessor to A.R.S. § 44–101(6) because neither Mrs. Heap nor Greer nor Greer's wife had signed it. The court stated:

We cannot see the applicability of this section to the facts here under consideration. The party here sought to be charged was the seller. She is the person who signed the memorandum. A contract in the form of a receipt is binding and will take the transaction out of the statute of frauds, and will support specific performance. *Finn v. Goldstein,* 201 Cal. 605, 258 P. 85 [1927].

65 Ariz. at 39, 173 P.2d at 644. In this case it is defendants and not plaintiff Jolly who are the "part[ies] to be charged...." Accordingly, Jolly's asserted failure to properly execute the "Supplement" signed by Kent on February 2, 1984 did not negate its sufficiency as a "memorandum" within A.R.S. § 44–101.

■ We are also of the opinion that the trial court erred to the extent it held that the signature of defendant Kent Realty, Inc. on the "Supplement" was such that it could not have given rise to an enforceable contract. The "Supplement" was prepared by or on behalf of defendant Kent Realty, Inc. Its handwritten provisions specifically designated it as a counteroffer to Jolly's counteroffer of February 1, 1984 and required that it be "accepted" by 5:00 p.m. on February 4, 1984. Immediately following the handwritten provisions appeared printed language which stated: "The undersigned acknowledge receipt of a copy hereof and authorize Broker to deliver a signed copy to Buyer." Defendant William Kent signed the document and dated it February 2, 1984 on blanks provided for those purposes directly under the quoted language. In our opinion, when defendant Kent signed the document, it constituted an unconditional counteroffer to form a contract on the terms stated therein.

Directly below Kent's signature appeared the following printed language:

Above modifications or additions are approved and accepted.

The undersigned acknowledge receipt of a copy hereof and authorize Broker to deliver a signed copy to Seller.

Right below this language, plaintiff Jolly signed and dated the "Supplement" on spaces provided for those purposes. In our opinion, Jolly's signature on the "Supplement" constituted an acceptance of the counteroffer. Leaving aside for the moment the question of whether defendant Kent Realty, Inc. had legal authority to enter into a sale contract that bound the remaining defendants, Jolly's signature was the last step needed for the formation of a contract.

Defendants nevertheless argue that Kent's signature was only "for the limited purpose of acknowledging receipt and authorizing delivery" of the document, and that because the parties never reached the "final acceptance stage of the negotia-

tions," no enforceable contract was ever executed. This argument fundamentally misreads the clear purpose of the printed form the parties used in this case. For ease of reference, we recapitulate the printed signature provisions of the "Supplement" as follows:

> The undersigned acknowledge receipt of a copy hereof and authorize Broker to deliver a signed copy to Buyer.
>
> Dated _____ X _____ X _____
> Seller Seller
>
> Above modifications are approved and accepted.
>
> The undersigned acknowledge receipt of a copy hereof and authorize Broker to deliver a signed copy to Seller.
>
> Dated _____ X _____ X _____
> Buyer Buyer
>
> FINAL ACCEPTANCE BY SELLER:
>
> Dated _____
>
> The above counter offer by Buyer(s) is approved and accepted. The undersigned acknowledge receipt of a copy hereof and authorize Broker to deliver a copy to Buyer.
>
> X _____ X _____
> Seller Seller

As we read it, the "Supplement to Real Estate Purchase Contract and Receipt for Deposit" was designed to be used either to convey a prospective seller's counteroffer to his prospective buyer, or to convey a prospective buyer's counteroffer to his prospective seller. Where the form is used as a counteroffer from prospective buyer to prospective seller, the prospective buyer signs and dates his counteroffer on the signature line for "Buyer" under the language "the undersigned acknowledge receipt of a copy hereof and authorize Broker to deliver a signed copy to Seller." If the prospective seller determines to accept the prospective buyer's counteroffer, he signs and dates the document on the lines provided under the words "Final Acceptance by Seller." In this situation, the "Seller" signature lines that appear above the signature lines for "Buyer" are superfluous and would be left blank.

Where the form is used to convey a counteroffer from a prospective seller to a prospective buyer, however, as occurred here, it is the provision beginning with "Final Acceptance by Seller" that would be left blank as unnecessary. In that instance the prospective seller would sign and date his counteroffer on the signature lines for "Seller" under the language "The undersigned acknowledge a receipt of a copy hereof and authorize Broker to deliver a signed copy to Buyer." If the prospective buyer determined to accept the counteroffer, he would sign and date the document in the spaces provided under the following language:

> Above modifications or additions are approved and accepted.
>
> The undersigned acknowledge receipt of a copy hereof and authorize Broker to deliver a signed copy to Seller.

Contrary to defendants' argument, in this situation the contract is complete when the prospective buyer signs the document. Accordingly, defendant Kent Realty's failure to sign the "Supplement" in this case under the "Final Acceptance by Seller" language below the "Buyer" signature lines did not prevent the formation of a contract.

■ We next consider the question of whether the trial court erred in dismissing plaintiffs' action on the ground that one co-tenant cannot bind his other co-tenants to a contract to sell jointly owned property under the circumstances of this case. We acknowledge the general proposition that a tenant-in-common cannot convey away or alienate the interest of another co-tenant unless he is clearly and properly authorized to do so. *Monaghan v. Barnes*, 48 Ariz. 213, 61 P.2d 158 (1936); *Beckstrom v. Beckstrom*, 578 P.2d 520 (Utah 1978); 86 C.J.S. *Tenancy in Common* § 119 (1954). Defendant Kent Realty, Inc. thus had no power to bind the remaining defendants to a contract to sell the real property based solely on its status as their co-tenant.

■ Plaintiffs nevertheless argue that defendant Kent Realty, Inc. had authority to enter into the contract on behalf of the remaining defendants independent of its status as their co-tenant. In support of

this argument plaintiffs cite defendant William Kent's statement to broker Jeffrey Jacobs and others that he had authority to act on behalf of his "partners." In the same vein, plaintiffs assert that in connection with the transaction at issue Kent consistently behaved as if he had such authority. It is clear, however, that Kent's own statements and behavior were insufficient as a matter of law to demonstrate the required authority. It is well settled that the declarations of an agent are insufficient to establish the fact or extent of his authority. *See Bank of America, National Trust and Savings Association v. Barnett,* 87 Ariz. 96, 348 P.2d 296 (1960); *Hudlow v. American Estate Life Insurance Co.,* 22 Ariz.App. 246, 526 P.2d 770 (1974); *Phoenix Western Holding Corporation v. Gleeson,* 18 Ariz.App. 60, 500 P.2d 320 (1972). Moreover, despite several opportunities to do so, plaintiffs produced no evidence that defendant Kent Realty, Inc. had express, implied or apparent authority to act for the remaining defendants in selling the subject property. *See generally Restatement (Second) of Agency* §§ 7, 8, 26, 27 and 49 (1958).

■ Plaintiffs also contend that defendant Kent Realty, Inc. had the power to bind the remaining defendants to the sale contract pursuant to A.R.S. §§ 29–209(A) and 29–210(D). A.R.S. § 29–210(D) provides:

> Where the title to real property is in the name of one or more or all the partners, or in a third person in trust for the partnership, a conveyance executed by a partner in the partnership name, or in his own name, passes the equitable interest of the partnership, provided the act is one within the authority of the partner under the provisions of subsection (A), of § 29–209.

A.R.S. § 29–209 provides in pertinent part:

> A. Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including the execution in the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership of which he is a member binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing has knowledge of the fact that he has no such authority.
>
> B. An act of a partner which is not apparently for the carrying on of the business of the partnership in the usual way does not bind the partnership unless authorized by the other partners.

If a partner's act in selling partnership real property constitutes "apparently carrying on in the usual way the business of the partnership," the provisions of A.R.S. § 29–209(A) (Uniform Partnership Act § 9(1)) supersede the requirement of the statute of frauds (A.R.S. § 44–101) that the partner have written authority to do so. *Ball v. Carlson,* 641 P.2d 303 (Colo.App. 1981); *Ellis v. Mihelis,* 60 Cal.2d 206, 32 Cal.Rptr. 415, 384 P.2d 7 (1963). If the sale of partnership real property does not constitute "apparently carrying on in the usual way the business of the partnership," however, the selling partner does not bind the partnership absent written authority executed by the remaining partners. *Feingold v. Davis,* 444 Pa. 339, 282 A.2d 291 (1971); *Ellis v. Mihelis, supra.*

■ For the purpose of examining plaintiffs' contention that defendant Kent Realty, Inc. had the power to bind the other defendants under A.R.S. § 29–209(A), we will assume that the joint venture agreement of January, 1979 established a partnership relationship among the defendants.[4] Defendant Kent Realty, Inc. had no

---

4. The fundamental requisites of a partnership are intention, co-ownership of business, community of interest, and community of power in administration. *Myrland v. Myrland,* 19 Ariz. App. 498, 508 P.2d 757 (1973). *See* A.R.S. §§ 29–206, 29–207. The essential elements of a partnership may be established by demonstrating the existence of an agreement between the putative partners to work together to acquire property for their joint benefit and to divide all the profits made therefrom equally. *Fernandez v. Garza,* 88 Ariz. 214, 354 P.2d 260 (1960). *See Mercer v. Vinson,* 85 Ariz. 280, 336 P.2d 854 (1959); *Tafoya v. Trisler,* 8 Ariz.App. 250, 445

written authority from its partners to sell the real property in question.[5] Kent Realty's agreement to sell the property to plaintiffs accordingly bound the partners only if Kent Realty was "apparently carrying on in the usual way the business of the partnership" in entering into that agreement. Plaintiffs argue that it was, citing the provision of the joint venture agreement that the joint venture's "objectives" included selling or exchanging apartment investments. We disagree. Although the joint venture agreement clearly contemplated that the joint venture's business activities might include the selling or exchanging of apartment investments, plaintiffs offered no evidence in the trial court that such activity was in fact a "usual" occurrence in the course of the joint venture's actual business operation. The only indication in the record on this point is actually to the contrary—the joint venture was formed in January of 1979 concurrently with the joint venturers' purchase of a particular apartment complex, and the joint venture continued to hold and operate the same apartment complex through the negotiations that generated this litigation. We accordingly conclude as a matter of law that defendant Kent Realty's actions did not constitute "apparently carrying on in the usual way the business of the partnership," and that its defendant partners were not bound under A.R.S. §§ 29–209(A) and 29–210(D) to sell their property in accordance with the contract between Kent Realty and plaintiff Jolly. *Cf. Macy v. Oswald,* 198 Pa.Super. 435, 182 A.2d 94 (1962) (partner cannot validly dispose of capital assets which are not partnership's stock-in-trade without consent of his co-partner). *Accord Matter of Verrazzano Towers, Inc.,* 10 B.R. 387 (E.D.N.Y.1981); *Ditzel v. Kent,* 131 Mont. 129, 308 P.2d 628 (1957); *Petrikis v. Hanges,* 111 Cal.App.2d 734, 245 P.2d 39 (1952). *See also Owens v. Palos Verdes Monaco,* 142 Cal.App.3d 855, 191 Cal.Rptr. 381 (1983).

Defendants have requested an award of attorney's fees on appeal pursuant to Rule 21(c)(1), Arizona Rules of Civil Appellate Procedure. In our discretion under A.R.S. § 12–341.01(A) we deny the request.

Affirmed.

GRANT, P.J., and MINKER, J., concur.

NOTE: The Honorable ALLEN G. MINKER, Greenlee County Superior Court Judge, was authorized to participate by the Chief Justice of the Arizona Supreme Court pursuant to Arizona Const. art. VI, § 3.

---

P.2d 452 (1968). A joint venture differs from a partnership principally because it is usually limited to a single transaction. *Rubi v. Transamerica Title Insurance Co.,* 131 Ariz. 403, 641 P.2d 891 (App.1981). A joint venture requires an agreement, a common purpose, a community of interest, and an equal right of control. *Sparks v. Republic National Life Insurance Co.,* 132 Ariz. 529, 647 P.2d 1127 (1982); *West v. Soto,* 85 Ariz. 255, 336 P.2d 153 (1959); *Ellingson v. Sloan,* 22 Ariz.App. 383, 527 P.2d 1100 (1974).

**5.** The provision of the joint venture agreement concerning "investment decisions" could not be construed as written authority for the sale absent evidence that the joint venturers had specifically approved it "by a 51% or more majority vote." Plaintiffs offered no such evidence in the trial court.