FIRST NATIONAL BANK AND TRUST
COMPANY OF WILLISTON, Plaintiff
and Appellant,

v.

Albinus SCHERR, individually and
d/b/a Scherr & Scherr, a general
partnership, Defendants and Appellees.

Civ. No. 900091.

Supreme Court of North Dakota.

March 19, 1991.

Winkjer, McKennett, Stenehjem, Murphy & Reierson, Williston, for plaintiff and appellant; argued by Kent A. Reierson.

Wheeler Wolf, Bismarck, for appellee Albinus Scherr; argued by Albert A. Wolf.

John T. Gassmann (argued), Valley City, for appellee Scherr & Scherr.

MESCHKE, Justice.

The First National Bank & Trust Company of Williston appealed from a judgment that Albinus Scherr, a partner, and Scherr and Scherr, the partnership, were not liable on a $65,000 note to the Bank signed for the partnership by only one partner, Pius Scherr, contrary to a restriction in the partnership agreement known to the Bank. We affirm.

Pius Scherr and Albinus Scherr started a general partnership to construct and invest in buildings. On September 15, 1981, this new partnership, Scherr and Scherr, opened a checking account at the Bank. The Partnership Checking Account Signature Card, signed by each of the partners, authorized the Bank

> to accept (whether or not payable to the partner who signs the same or to any other partner) checks, endorsements, notes, ... mortgages or any other instruments for the deposit or withdrawal of funds, for borrowing money and pledging or mortgaging assets of the partnership as security for the payment thereof and for the transaction of any other business with it, when signed by any _____ of the undersigned.

A separate box adjacent to the partners' signatures on the signature card had in it printed instructions, "Number of Signatures Required," and was filled in with a typed "1." This signature card was kept in the checking account files, not the loan files, of the Bank.

Later a written partnership agreement was completed. It was dated, signed, and acknowledged by Pius on October 1, 1981, and by Albinus on December 21, 1981, when a copy was delivered to the Bank. This agreement included a clause restricting the authority of a single partner to engage in certain transactions for the partnership:

> Neither partner shall, without the written consent of the other partner, endorse any note, or act as an accommodation party, or otherwise become surety for any person. Without the written consent of the other partner, neither partner shall on behalf of the partnership borrow or lend money, or make, deliver or accept any commercial paper, or execute any mortgage, security agreement, bond or lease, or purchase or contract to purchase, or sell or contract to sell any property for or of the partnership. Neither partner shall, except with the written consent of the other partner, assign, mortgage, grant a security interest [sic] in, or sell his share in the Partnership or in its capital assets or property, or enter into any agreement as a result of which any person shall become interested with him in the Partnership, or do any act detrimental to the best interests of the Partnership or which would make it impossible to carry on the ordinary business of the Partnership.

The signed copy of the partnership agreement was completed and delivered to the Bank at its request, and was kept in the Bank's loan file for the partnership.

Beginning in November 1981 and continuing into 1984, Scherr and Scherr borrowed large sums from the Bank to acquire property and to construct various buildings in Williston. One venture was construction of a building leased to a Famous Recipe Chicken fast-food franchisee. This project began with a mortgage, signed by both Pius and Albinus, to the Bank on April 29, 1983, for a construction advance of $100,000. Later, Pius alone signed the four notes to the Bank drawing on this short-term loan: One on May 2, 1983 for $10,000; another on June 2, 1983 for $20,000; the third on July 14, 1983 for $15,000; and the fourth note on August 1, 1983 for $55,000. This loan was soon converted to a $100,000 note secured by a long-term mortgage to the Bank, both dated October 26, 1983, and both signed by Pius and Albinus.

The next day, October 27, Pius Scherr alone signed another short-term partnership note to the Bank for $65,000. This note was filled in to say, "THE PURPOSE OF THIS LOAN IS: *Final construction on Famous Recipe Chicken.*" The Bank repeatedly renewed this note through May 1985. Each renewal note was signed for the partnership by Pius alone.

The Scherrs defaulted on their Famous Recipe Chicken obligations to the Bank. The Bank foreclosed the $100,000 mortgage, and then sued the Scherrs to collect the $65,000 note. The trial court entered summary judgment for the Bank against Pius, Albinus, and the partnership for the balance due on the $65,000 note and interest. Pius, Albinus, and the partnership appealed. We affirmed the summary judgment against Pius but reversed the summary judgment against Albinus and the partnership. *First National Bank and Trust Company of Williston v. Scherr,* 435 N.W.2d 704 (N.D.1989) (*Scherr I*). We remanded for trial on the effect of the restriction in the partnership agreement on the liability of Albinus and the partnership to the Bank.[1]

---

1. After remand in *Scherr I,* Pius moved for relief from the summary judgment against him because of newly discovered evidence. He urged that the $65,000.00 note was not unsecured, but rather was secured by the earlier construction mortgage of April 29, 1983, which remained on record. Pius argued that enforcement of the $65,000 note against him was barred by the anti-deficiency judgment statutes because a mortgage against the property had been foreclosed. The trial court denied Pius's motion for relief, and Pius appealed. In *First*

After trial on remand, the trial court determined that Pius was not authorized to sign the unsecured, $65,000 note for the partnership because the Bank "had written knowledge" about the specific restriction on his authority in the partnership agreement, and because the Bank "thereafter established a course of conduct of business with the partnership consistent with those restrictions." The trial court felt that it was "arguable but questionable" whether the signature card authorization bound the partnership to a promissory note signed by one partner. The trial court ruled that, "in any event, the restrictive language ... in the Partnership Agreement ... overrides and controls the signature card in the event of conflict." The court concluded that Albinus and the partnership were not liable on the note, and entered judgment dismissing the Bank's claim against them. The Bank appealed. This is *Scherr III.*

On appeal, the Bank argues that the signature card authorization was a controlling agreement between the Bank and the partnership, because Albinus thereby consented to Pius's lone signature on the $65,000 note. According to the Bank, any difference between the terms of that authorization and the terms of the later partnership agreement is immaterial. The Bank argues that the partnership's direct authorization to the Bank was not altered by the later restrictive agreement between partners, even though the Bank knew about it.

In *Scherr I,* we recognized that statutes regulate the authority of a partner to act for the partnership. North Dakota has adopted the Uniform Partnership Act, as have nearly all states. *See* note on *Comparative Legislation* following NDCC 45–05–01 (Supp.1989). NDCC 45–06–01 (part) says:

1. Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including the execution in the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership ... binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing has knowledge of the fact that he has no such authority.

\* \* \* \* \* \*

4. No act of a partner in contravention of a restriction on authority shall bind the partnership to persons having knowledge of the restriction.

As this statute pronounces, a partner's liability to a third-person is largely fixed by the law of agency. Restatement (Second) of Agency § 14A comment a (1958). Also, NDCC 45–05–03(3) says, "[t]he law of agency applies under this title." Agency law, then, controls this case.

█ A partner, as an agent of the partnership, normally binds the partnership by executing any instrument that carries on the business of the partnership in the usual way. NDCC 45–06–01(1). But, as with any agent, that is not so if the partner's authority is restricted, and if the restriction is known to the person with whom the partner deals. *Id.* The repetition in NDCC 45–06–01(4) emphasizes that the law commands a different result when a partner acts "in contravention of a restriction on [his] authority" in dealing with someone "having knowledge of the restriction."

Many decisions by other courts have ruled that a person cannot recover from a second partner or the partnership for additional transactions with an acting partner after that person had notice of a later restriction on the acting partner's authority. *Van Dusen v. The Star Quartz Mining Company,* 36 Cal. 571 (1869); *Baxter v. Rollins,* 90 Iowa 217, 57 N.W. 838 (1894); *Dawson Blakemore & Co. v. Elrod,* 105 Ky. 624, 49 S.W. 465 (1899); *Bank of Bellbuckle v. Mason,* 139 Tenn. 659, 202 S.W. 931 (1918); *Dayle L. Smith Oil Co. v.*

National Bank and Trust Co. of Williston v. Scherr, 456 N.W.2d 531 (N.D.1990) (*Scherr II*), we reversed, directed relief from the summary judgment, and remanded for trial on whether the $65,000.00 note was secured or unsecured. We are told that Pius filed bankruptcy, and that the Bank's claim against Pius has been resolved in the bankruptcy court.

*Continental Supply Co.*, 268 S.W. 489 (Tex.Civ.App.1924); *Gladson v. Heagle*, 170 Minn. 166, 212 N.W. 175 (1927); *T.T. Word Supply Co. v. Burke*, 57 S.W.2d 610 (Tex.Civ.App.1933); *DeSantis v. Miller Petroleum*, 29 Cal.App.2d 679, 85 P.2d 489 (1938); *West Side Trust Company v. Gascoigne*, 39 N.J.Super. 467, 121 A.2d 441 (1956); *Arrington v. Columbia Nitrogen Corporation*, 168 Ga.App. 455, 309 S.E.2d 428 (1983). *See also* 59A Am.Jur.2d *Partnership*, § 267 (1987); 68 C.J.S. *Partnership* § 143 (1950). *Compare Owens v. Palos Verdes Monaco*, 142 Cal.App.3d 855, 191 Cal.Rptr. 381, 386–90 (1983). These precedents demonstrate that knowledge of a restriction on, or revocation of, an individual partner's authority controls over a preexisting arrangement with a creditor.

In this case, Pius had initial authority to act individually for the partnership in borrowing money from the Bank through the signature card authorization. Afterward, the partnership agreement restricted that authority. When a third person has "previously extended credit" to the principal through the agent "in reliance upon a manifestation from the principal of continuing authority in the agent," that authority can be restricted or revoked by notice to the third person. Restatement (Second) of Agency § 136(2)(a) (1958). N.D.C.C. 3–01–11 (part) says that, "[u]nless the power of an agent is coupled with an interest in the subject of the agency, it is terminated as to every person having notice thereof by: 1. Its revocation by the principal...." The question in this case is whether delivery of the written partnership agreement to the Bank was effective notice that Pius's individual authorization had been restricted. The trial court found as a matter of fact that effective notice of restriction had been given.

▪ One who claims that an agent acted within his authority has the burden of proving the scope of that authority. *Red River Commodities, Inc. v. Eidsness*, 459 N.W.2d 805, 810 (N.D.1990). The scope of an agent's authority is a question of fact. *Id.* "If a person dealing with an agent has notice that the agent's authority is created or described in a writing which is intended for his inspection, he is affected by limitations upon the authority contained in the writing, unless misled by conduct of the principal." Restatement (Second) of Agency § 167 (1958). No question of fraud on the part of the partnership was raised in the trial court, or pursued on this appeal. "A person has 'notice' of a fact within the meaning of this title when the person who claims the benefit of the notice: ... 2. Delivers through the mail, or by other means of communication, a written statement of the fact to such person or to a proper person at his place of business...." NDCC 45–05–02(part). The trial court determined that notice of a restriction had been given to the Bank by delivery of the executed partnership agreement.

The signature card did not stand alone. After the signature card, the Bank sought, received, and knew about a later partnership agreement that restricted one partner's power to borrow for the partnership without the consent of the other partner. There is no claim, in this case, that the partnership subsequently ratified the $65,000 note to the Bank. *Compare Askew v. Joachim Memorial Home*, 234 N.W.2d 226 (N.D.1975). Under agency principles and the Uniform Partnership Act, the trial court's factual determinations that Pius acted in contravention of a restriction on his authority as a partner, known to the Bank, controls this case.

Findings of fact shall not be set aside unless clearly erroneous. NDRCivP 52(a). A choice between two permissible views of the evidence is not clearly erroneous even when the trial court's findings are based on documentary evidence or inferences from the documents or other facts. Explanatory Note to NDRCivP 52(a); *Stracka v. Peterson*, 377 N.W.2d 580 (N.D.1985). We conclude that the trial court's finding, that the Bank was bound by its knowledge of the restriction in the written partnership agreement delivered to the Bank after the signature card, was not clearly erroneous.

We affirm.

ERICKSTAD, C.J., and LEVINE, VANDE WALLE and GIERKE, JJ., concur.