CONNECTICUT NATIONAL BANK *v.* MARK COOPER ET AL.
(15110)
(15111)

CONNECTICUT NATIONAL BANK *v.* CCM LAND DEVELOPING, INC., ET AL.
(15112)

PETERS, C. J., and CALLAHAN, BORDEN, KATZ and PALMER, Js.

Argued January 6—decision released March 28, 1995

*Jeffrey J. Tinley*, with whom was *William T. Blake, Jr.*, for the appellant (defendant Southbury Affiliates, Limited Partnership).

*James Wu*, with whom was *Brian Shagan*, for the appellee (plaintiff).

CALLAHAN, J. The dispositive issue in this appeal is whether the trial court properly refused to open the stipulated judgments that had been rendered against the defendants Southbury Affiliates, Limited Partner-

ship (partnership), and Mark Cooper, a limited partner in that partnership, in the absence of the consent of the partnership's limited partners. The plaintiff, Connecticut National Bank, now known as Shawmut Bank (bank), had filed three separate complaints against Cooper demanding payment on nineteen defaulted promissory notes.[1] Each complaint also contained one count of fraudulent conveyance against the partnership, alleging that Cooper had assigned his interest in the limited partnership back to the partnership without consideration or, alternatively, with the intent to hinder, delay or defraud his creditors, and that the partnership had consented to the assignment with knowledge of the fraudulent purpose. A stipulated judgment was rendered by the trial court, *Glass, J.*, on July 1, 1986, that purportedly resolved all the bank's claims in the three complaints and also settled its claims concerning two other defaulted notes on which Cooper was liable, but on which the bank had not yet filed suit.[2] It is undisputed that the limited partners had not given their written consent to the stipulated judgment. On August 21, 1990, the partnership moved to open the judgment. After holding a four day hearing on the partnership's motion; see footnote 2; the trial court, *Pellegrino, J.*, denied the motion. The partnership appealed from the judgment of the trial court to the

[1] The first complaint, Docket No. 0075733S, involved seventeen promissory notes, sixteen of which were executed by H & S Contractors, Inc./Energy Homes, Inc. (H & S), and endorsed by Cooper, and one of which was executed by Cooper. The second complaint, Docket No. 0075734S, involved one promissory note executed by Cooper and Ralph Crozier, who initially was Cooper's partner, and endorsed by CCM Land Developing, Inc. (CCM). The final complaint, Docket No. 0075735S, involved one promissory note executed by CCM and endorsed by Cooper. H & S and CCM were related companies under the direction of Cooper.

[2] The stipulated judgment was rendered in each of the three lawsuits that the bank had filed. The partnership filed a motion to open the judgment in each case. For purposes of this consolidated appeal, reference to the stipulated judgment and to the partnership's motion applies to all three cases.

Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).[3] We reverse the judgment of the trial court.

The factual history of this case is convoluted. Cooper was the original general partner of what ostensibly was a limited partnership, which had been formed in 1984 for the purpose of developing a large parcel of real estate located in Southbury, known as the Uniroyal Farm.[4] Harvey Gordon, Cooper's uncle, became the general partner of the limited partnership upon Cooper's resignation from that position later in 1984. The partners thereafter entered into a written limited partnership agreement, dated April 1, 1985, and a certificate of limited partnership was filed with the secretary of the state on May 14, 1985. Both documents were prepared by attorney George Adams, who represented the partnership at the time. Gordon and Cooper had assembled the group of investors who became the limited partners in the partnership. The investors for the most part were either associated with Gordon through his business as a certified public accountant, or were familial relations or friends of Gordon and Cooper.[5]

On March 28, 1986, the bank filed three complaints against Cooper for nonpayment of defaulted promissory notes and against the partnership for fraudulent conveyance. The bank also filed motions for prejudg-

[3] Before the cases were transferred to this court, the Appellate Court, sua sponte, consolidated the three appeals.

[4] Initially no written partnership agreement existed and no certificate of limited partnership was filed with the secretary of the state.

[5] The limited partners who signed the limited partnership agreement were Harold Merritt, Sheldon and Sheldon (by Glenn Gordon, partner), Mark Cooper, Anthony Silano, Aronson and Aronson (by Bernard Aronson, partner), Leonard Cooper, Gerald Shukow, Ruth Sheldon, Gertrude Cooper, Herbert Haber, Conn Job (by Michael Aboff, partner) and Charlene White. Harvey Gordon signed as the general partner.

ment remedies against the partnership. On May 13, 1986, the parties to the lawsuits met to discuss a possible settlement of the bank's claims. In attendance at this meeting were Gordon, Cooper, two other limited partners of the partnership, attorney George Adams representing the partnership, attorney David Collins representing the bank, attorney Morris Olmer representing Cooper, and the bank's loan officer, Theodore Maniatis. At the hearing to open the judgment, Maniatis testified that the partnership, at the May 13, 1986 meeting, had espoused the position that, although no fraudulent conveyance had taken place, it nonetheless would offer to settle the matter only as to the partnership for $100,000. The bank had rejected that offer. According to Maniatis, the meeting ended with an outstanding offer from the partnership to settle all claims in the complaint, against both Cooper and the partnership, for $250,000. The partnership disputes that any offer was ever made to settle any claim against Cooper. The trial court made no factual findings about what actually had transpired at the meeting.

When settlement negotiations failed, a hearing was scheduled on the bank's motions for supplemental prejudgment remedies for June 30, 1986. Adams informed Gordon of the hearing by letter, and indicated that he would not file an appearance for the partnership "without a substantial retainer." The trial court found that, after Gordon had received Adams' letter, Gordon had asked Olmer to represent the partnership at the June hearing, with the understanding that Cooper would pay Olmer's fee. The trial court further found that Olmer had discussed strategy with Gordon on June 24, 1986, before the hearing, and on July 2, 1986, after the hearing. According to the trial court, "Olmer was, in fact . . . given specific authority from . . . Gordon to settle the matters on behalf of the Partnership in accordance with the terms of the stipulated judgment."

On June 27, 1986, Adams responded to a subpoena duces tecum from the bank by delivering to the bank's attorney, James Wu, all of the documents that he had in his possession regarding the partnership. The documents included a copy of the limited partnership agreement dated April 1, 1985. At the hearing on the motion to open the judgment, Wu stipulated that he had received and reviewed this document prior to the July 1, 1986 stipulated judgment. Adams did not enter an appearance or represent the partnership in connection with the bank's claims.

On June 30, 1986, the parties appeared before the Superior Court in Waterbury and requested time to pursue settlement discussions. The court consequently continued the supplemental prejudgment remedy hearing until the next day, July 1, 1986.[6] On July 1, 1986, the parties filed appearances with the trial court clerk: Wu appeared for the bank; Cooper appeared pro se; Olmer appeared as counsel for the partnership; and attorney Ralph Crozier appeared pro se and as counsel for Anthony Silano.[7] The parties then sought and were granted a recess in order to continue settlement negotiations. The trial court found that during this recess Crozier had overheard Cooper and Olmer make a telephone call to Gordon with regard to the contemplated settlement agreement.[8]

[6] The transcript of the limited discussions in court on June 30, 1986, was destroyed. There is no disagreement between the parties, however, as to what occurred on that day.

[7] Crozier initially had been a general partner with Cooper in the acquisition of the real estate, which was the primary asset of the partnership. Crozier was a defendant in one of the complaints; see footnote 1; and Silano was a garnishee in the bank's original prejudgment remedy, which had been granted by the court on March 27, 1986.

[8] Crozier testified: "He said: [Gordon], this is [Olmer], we're in court, we're about to stipulate. We're getting down to the nitty-gritty and I have to pass something by you with regards to a guarantee."

On July 1, 1986, after the recess, the parties reported to the court that they had reached an agreement, which was read into the record and, at the parties' request, recorded as a stipulated judgment. The essential terms of the stipulated judgment were: (1) a stipulation by the defendants that the allegations of the complaints were true; (2) an agreement that Cooper would pay the bank $340,000, plus interest at the bank's prime rate, out of his proceeds from the contemplated sale of the partnership property; and (3) an agreement that the partnership would execute a written guarantee of the judgment.[9] The payment of the judgment was to be in satisfaction of all nineteen promissory notes cited in the bank's three complaints, as well as two other notes for which Cooper was liable but which were not mentioned in the bank's complaints. The bank agreed to release the prejudgment attachment of the partnership property upon payment.

At the hearing on the motion to open the judgment; see footnote 2; Gordon denied having authorized the stipulation or knowing that Olmer had been retained

[9] The record reflects that Wu described the stipulated judgment in relevant part as follows: "Your Honor, with regard to the settlement, the plaintiff, Connecticut National Bank, has agreed with both Southbury Affiliates, Limited Partnership, represented by Attorney Morris Olmer, and with Mr. Mark Cooper, who is an individual defendant who is representing himself, to the following: the defendants will—these defendants will stipulate that the allegations of all three complaints are true . . . . [T]hree hundred and forty thousand dollars will be paid by the defendant, Mark Cooper. He has agreed to pay interest at the prime rate of Connecticut National Bank from today's date until the date the property . . . we are seeking to attach [is closed upon]. The tentative closing date is January 2, 1987.

"In addition, there will be a written guaranty signed by Southbury Affiliates, Limited Partnership, guarantying the payment of three hundred and forty thousand dollars by Mark Cooper. Such payment will be made by Southbury Affiliates, Limited Partnership, at the time of closing . . . .

"If there is no closing on January 2, 1987, the bank and all of the defendants, Southbury Affiliates, Limited Partnership, and Mark Cooper, individually, have agreed that the debt will be paid by either defendant by July 1, 1987 . . . ."

to represent the partnership, although he did testify that he had spoken to Olmer on July 2, 1986, the day after the judgment was rendered. He testified that they had spoken only "for a moment or two and just bypassed anything except hello and so forth and that was it." The trial court, however, did not find Gordon's testimony credible in this regard.

On August 1, 1986, the bank forwarded the proposed guarantee to Olmer for the partnership to execute; the guarantee, however, was never signed. At the hearing on the motion to open the judgment; see footnote 2; Olmer testified that he had given the guarantee to Cooper with the expectation that Cooper would forward it to Gordon, but it is unclear whether Gordon ever received it. The sale of the partnership property, which at the time of the stipulated judgment was expected to be consummated on January 2, 1987, never took place. On June 29, 1987, the bank wrote to Gordon informing him that Cooper had not paid the debt, and that the bank could enforce the judgment against the partnership after July 1, 1987. Gordon later claimed that this was his first inkling that the stipulated judgment existed. Subsequent to receipt of the bank's letter, Gordon requested a transcript of the July 1, 1986 hearing from the bank. He acknowledged receiving the transcript, but neither he nor the bank took any further action at that time.

Almost four years later, in May, 1990, the bank filed a motion to enforce the stipulated judgment and also filed a motion for contempt against Cooper and the partnership.[10] Shortly thereafter, over the weekend of June 9, 1990, Cooper died in a plane crash. On August 21, 1990, the partnership subsequently filed the motion to open the stipulated judgment. See footnote 2.

---

[10] A hearing has never been held on the bank's motion to enforce the judgment or on its motion for contempt.

The trial court denied the partnership's motion. This appeal followed.

On appeal, the partnership claims that the stipulated judgment should be opened because it was procured by fraud or in the actual absence of consent by the partnership. We agree that there was an actual absence of consent for the partnership to enter into the stipulated judgment. We therefore reverse the judgment of the trial court, and remand the case with direction to grant the partnership's motion to open the judgment as to it.[11]

Generally, a judgment rendered in the Superior Court cannot be opened unless a motion to open is filed within four months following the date that the judgment was rendered. General Statutes § 52-212a; Practice Book § 326.[12] The partnership's motion to open the stipulated judgment was filed over four *years* after the judgment was rendered.[13] However, "[i]t is a well-established gen-

---

[11] Although the trial court found absolutely no evidence to support the partnership's claim of fraud, we need not address this issue due to our conclusion that the judgment must be opened on the ground of lack of consent.

[12] General Statutes § 52-212a provides in relevant part: "Unless otherwise provided by law . . . a civil judgment or decree rendered in the superior court may not be opened or set aside unless a motion to open or set aside is filed within four months following the date on which it was rendered or passed. . . ."

Practice Book § 326 provides in relevant part: "Unless otherwise provided by law . . . any civil judgment or decree rendered in the superior court may not be opened or set aside unless a motion to open or set aside is filed within four months succeeding the date on which it was rendered or passed. The parties may waive the provisions of this paragraph or otherwise submit to the jurisdiction of the court."

[13] On appeal, the bank claims that the equitable doctrine of laches should apply to this case. Because at least two limited partners were at the proceeding in which the judgment was stipulated to, the bank argues that the knowledge of those limited partners should be imputed to the other limited partners not present at the proceeding; see General Statutes § 34-50; and that the partnership's inaction for four years with knowledge of the judgment should bar its opening the judgment. General Statutes § 34-43 provides: "In any case *not provided for in this chapter* the rules of law and

eral rule that even a judgment rendered by the court upon the consent of the parties, which is in the nature of a contract to which the court has given its approval, can subsequently be opened [after the four month limitation] . . . if it is shown that the stipulation, and hence the judgment, was obtained by fraud, *in the actual absence of consent*, or because of mutual mistake." (Emphasis added; internal quotation marks omitted.) *Celanese Fiber* v. *Pic Yarns, Inc.*, 184 Conn. 461, 466, 440 A.2d 159 (1981); *Kenworthy* v. *Kenworthy*, 180 Conn. 129, 131, 429 A.2d 837 (1980).

The partnership does not dispute the trial court's finding that Gordon authorized Olmer to represent the partnership. Nonetheless, the partnership claims that the stipulated judgment was rendered "in the actual absence of consent" because the limited partnership agreement prohibited the general partner from confessing a judgment against the partnership without the written consent of the limited partners. The limited

---

equity, including the law merchant, shall govern." (Emphasis added.) Because General Statutes § 34-47 (4) specifically provides that *"[n]o act of a partner in contravention of a restriction on authority shall bind the partnership to persons having knowledge of the restriction"* (emphasis added), and because the bank had knowledge of the restriction, this case is governed by the Uniform Partnership Act, and the equitable doctrine of laches does not apply. It would be particularly inappropriate to have laches apply in the case of limited partners because they do not actively participate in the management of the partnership's affairs.

Similarly, the bank also claims that because all of the limited partners either had actual knowledge or should be ascribed imputed knowledge of the stipulated judgment, the partnership ratified the stipulated judgment by its silence. Because a judgment confessed by a partner without the consent of the limited partners is not void, but only voidable; see 59A Am. Jur. 2d § 761, p. 614, and cases cited therein; subsequent ratification of the stipulated judgment by the limited partners may act to bind the partnership. Id. Because there is no evidence, however, that the limited partners not present at the court proceeding had actual knowledge of the stipulated judgment, and because imputing knowledge of the stipulated judgment to those limited partners absent from that proceeding would render § 34-47 (4) essentially meaningless, there is no merit to the bank's claim of ratification.

partnership agreement explicitly provides that "[w]ithout the prior written consent of a majority in interest of the Limited Partners, the General Partner shall not . . . confess a judgment against the Partnership."

General Statutes § 34-47 (4) provides: "No act of a partner in contravention of a restriction on authority shall bind the partnership to persons having knowledge of the restriction." The partnership argues that because the bank's attorney acknowledged that he had received and had reviewed the limited partnership agreement prior to the stipulated judgment, the bank had knowledge of the restriction on Gordon's authority to agree to the stipulation. The partnership, therefore, argues pursuant to § 34-47 (4) that it is not bound by the stipulation. In short, the partnership contends that because the judgment was confessed without the prior written consent of the limited partners as required by the partnership agreement, and the restriction in the agreement was known to the bank, the judgment must be opened as to the partnership. We agree.

Section 34-47, which is part of the Uniform Partnership Act (UPA), was codified in Connecticut in 1961. The UPA applies to limited partnerships except insofar as it is inconsistent with the Uniform Limited Partnership Act. General Statutes § 34-44; *Fidelity Trust Co.* v. *BVD Associates*, 196 Conn. 270, 274, 492 A.2d 180 (1985). General Statutes § 34-17 (a), which is part of the Uniform Limited Partnership Act, provides: "Except as provided in this chapter or in the partnership agreement, a general partner of a limited partnership shall have all the rights and powers and be subject to all the restrictions of a partner in a partnership without limited partners." Because § 34-47 is not inconsistent with § 34-17 (a), the limitation provided in § 34-47 (4) applies to the general partner of a limited partnership.

No previous cases in Connecticut have interpreted § 34-47 (4). Moreover, there is no helpful legislative history of § 34-47 (4) or edifying commentary on the identical subsection in the UPA. Other jurisdictions, however, have interpreted equivalent language in their states' codification of the UPA. For instance, under a provision with language identical to that of § 34-47 (4), the North Dakota Supreme Court, in *First National Bank & Trust* v. *Scherr*, 467 N.W.2d 427, 429 (N.D. 1991), held that a "partner, as an agent of the partnership, normally binds the partnership by executing any instrument that carries on the business of the partnership in the usual way. . . . But, as with any agent, that is not so if the partner's authority is restricted, and if the restriction is known to the person with whom the partner deals." See *Evans* v. *Pioneer Bank of Evanston*, 809 P.2d 251, 254–55 (Wyo. 1991) ("In summary, we hold that the Partnership Agreement required that all managing partners consent to the promissory note and that [the bank] knew of this requirement. Because of [the bank's] knowledge of the limitation contained in the Partnership Agreement, it had the burden to prove consent by all managing partners.").

General principles of agency law are in accord. General Statutes § 34-42 (3), which is part of the UPA, provides: "The law of agency shall apply under this chapter."[14] "It is an acknowledged principle of agency law that a principal may limit the powers of his agent and that all parties who deal with the agent with knowledge of the limitation are bound by its terms. *Fischer Co.* v. *Morrison*, 137 Conn. 399, 402, 78 A.2d 242 [1951] . . . ." *Conte* v. *Dwan Lincoln-Mercury, Inc.*, 172 Conn. 112, 125, 374 A.2d 144 (1976); see *Slocum*

---

[14] Other jurisdictions have looked to the common law when considering issues arising under the UPA, because the UPA generally is consistent with the common law prior to its enactment. *Shafer Bros.* v. *Kite*, 43 Md. App. 601, 607 n.2, 406 A.2d 673 (1979).

v. *New York Life Ins. Co.*, 228 U.S. 364, 374, 33 S. Ct. 523, 57 L. Ed. 879 (1913) ("[o]ne who deals with an agent, knowing that he is clothed with a circumscribed authority and that his act transcends his powers, cannot hold his principal"). Under facts analogous to those in this case, the terms of a partnership agreement have been enforced against persons having knowledge thereof. *Green River Associates* v. *Mark Twain Kansas City Bank*, 808 S.W.2d 894, 897 (Mo. App. 1991) (bank's knowledge of limitations on general partner's authority contained in limited partnership agreement precluded enforcement of promissory note against partnership).

The manifest intent of § 34-47 (4) is to protect innocent partners, in this instance limited partners, from the undertakings of a general partner in contravention of a specific restriction on the authority of the general partner, when the restriction is known to the third party with whom the partner is dealing. The purpose of placing a restriction on a general partner's authority in a partnership agreement and the policy embodied in § 34-47 (4) would be defeated if one who was aware of a restriction on a partner's authority could ignore the restriction and hold the partnership to an unauthorized agreement.

Notably, at the hearing on the partnership's motion to open the judgment, Gordon's undisputed testimony was that he had not received the prior written consent of any, let alone a majority in interest, of the limited partners authorizing him to enter into a stipulated judgment to settle the lawsuits filed by the bank.[15] Moreover, the record contains no evidence that any consent, written or otherwise, was given by a majority in inter-

---

[15] The trial court's memorandum of decision stated: "The court finds that Mr. Olmer was, in fact, retained to represent the Partnership, [and] that he was given specific authority *from Mr. Gordon* to settle the matters on behalf of the Partnership in accordance with the terms of the stipulated judgment." (Emphasis added.)

est of the limited partners.[16] Because the bank had received and had reviewed the limited partnership agreement prior to the stipulation, it was a "[person] having knowledge of the restriction" under the statute. Accordingly, pursuant to § 34-47 (4), the partnership is not bound by Gordon's confession of judgment against the partnership.[17]

The judgments are reversed in part and the cases are remanded to the trial court with direction to grant the partnership's motions to open the judgments as to it.

In this opinion the other justices concurred.

---

[16] Apparently Olmer, who entered an appearance for the partnership, did not himself have actual knowledge of the restriction on Gordon's authority, nor had he ever received a copy of the limited partnership agreement.

[17] Because the issue is not here presented, we need not decide whether the judgment may be enforced against Gordon's personal assets. There is authority, however, for the proposition that "a confession of judgment made by a partner on behalf of a partnership is valid . . . as to the partner confessing and can affect only that partner's individual property and his interest in the partnership effects." *Scanlon* v. *Kuehn*, 225 App. Div. 256, 258, 232 N.Y.S. 592 (1929); see *North & Scott* v. *Mudge & Co.*, 13 Iowa 496, 498 (1862) ("the judgment was good and binding on the party or partner confessing the same"); *Shafer Bros.* v. *Kite*, 43 Md. App. 601, 607, 406 A.2d 673 (1979) (" 'where one partner does . . . confess judgment as against all the partners, without the consent of his copartners, the judgment thus confessed binds only the partner confessing' "); *Morgan* v. *Richardson*, 16 Mo. 409, 411 (1852) ("The authorities are abundant to show that one partner cannot confess a judgment which will bind his co-partner. . . . It does not appear that the judgment against [the partner confessing judgment] has been vacated, nor will we interfere with it."); *Rubin* v. *A. C. Kluger & Co.*, 86 Misc. 2d 1014, 1016, 383 N.Y.S.2d 828 (1976) ("[t]he confession of judgment is ineffective against the partnership and is valid only as to the private assets of the confessing partner and possibly against the confessing partner's share of partnership income"); *Van Scoten* v. *Botsford & Kunes*, 98 Pa. Super. 270, 273 (1930) ("It is definitely settled that one partner does not have an implied authority to confess judgment against another partner for a partnership debt. The judgment is, therefore, void against a non-assenting partner, but it is good against the partner confessing it . . . ."); see also 59A Am. Jur. 2d § 761, p. 614 (1987).