MARK AND ANNIE SCHACHTER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Schachter v. Commissioner
Docket No. 18390-91
United States Tax Court
T.C. Memo 1994-273; 1994 Tax Ct. Memo LEXIS 273; 67 T.C.M. (CCH) 3092; June 15, 1994, Filed *273 Decision will be entered under Rule 155. Mark Schachter, pro se. For respondent: Catherine K. Chastanet. BEGHE
BEGHE
MEMORANDUM FINDINGS OF FACT AND OPINION BEGHE, Judge: Respondent determined a $ 10,657 deficiency in petitioners' 1978 Federal income tax and additional interest under section 6621(c). By reason of the death of petitioner Annie Schachter, with neither an estate nor appointment of a legal representative, her case will be dismissed for lack of prosecution, and decision entered against her in accordance with our decision herein. All further references to petitioner are to Mark Schachter. All section references are to the Internal Revenue Code in effect for 1978. All Rule references are to the Tax Court Rules of Practice and Procedure. In a stipulation of settled issues, petitioner conceded the following adjustments made by the statutory notice: (1) Petitioner is not entitled to deduct any part of the $ 47,729 that he claimed as his distributive share of losses in respect of his general and limited partnership interests in Lansing Cable Television Co. (Lansing); and (2) petitioner is not entitled to deduct $ 2,155 of the $ 2,645 distributive share of partnership *274 loss that he claimed in respect of his interest in Northwest Houston Properties. The issues remaining for decision are whether petitioner may exclude from income (1) $ 16,850 that he reported as guaranteed payment income from Lansing and (2) $ 10,000 that he reported as income received from Stonebridge Associates Inc. (Stonebridge), amounts that petitioner originally reported as income in his 1978 joint return and disavowed in the petition, and (3) whether petitioner is liable for additional interest under section 6621(c) on a substantial underpayment of tax attributable to tax-motivated transactions. We hold that petitioner is not entitled to exclude $ 16,850 of income from Lansing, but that he did not receive, and therefore is entitled to exclude, $ 10,000 that he originally reported as income from Stonebridge, and that he is not liable for additional interest under section 6621(c) on any portion of the redetermined deficiency. FINDINGS OF FACT Some facts have been stipulated, and are so found. The stipulation of facts and the attached exhibits are incorporated herein. Petitioner resided in Huntington, New York, when the petition in this case was filed. Petitioners filed *275 a joint Federal income tax return for 1978. During 1977 and 1978, and thereafter, petitioner was the general partner and a limited partner of Lansing, a New York limited partnership that was organized in 1977 to acquire and exploit the franchises for a community antenna television system in Lansing, Michigan. Lansing's confidential memorandum dated June 14, 1977, addressed to prospective investors, described the transactions that Lansing proposed to enter into: (1) With BFM Constructors, Inc. (BFM) to construct a cable TV system and acquire the equipment to be used in the system, to obtain a warranty, to assign the franchise to Lansing, and to obtain a non-competition agreement; (2) with North Country Financial Corporation (NCF), to provide for financing in connection with the operation of the system; and (3) with Lansing Cable Television Management Company (Lansing Management), to provide for the management, advertising and promotion of the system. BFM and NCF played similar roles in the cable television transactions in Finoli v. Commissioner, 86 T.C. 697 (1986) and Carlson v. Commissioner, T.C. Memo 1987-306, and the *276 format of the proposed transactions, as described in the confidential memorandum, was similar in many respects to those in Finoli v. Commissioner and Carlson v. Commissioner, supra.
The confidential memorandum stated that petitioner would make a capital contribution of $ 7,000 to acquire his general partner's interest in Lansing, and he did make that contribution and became the general partner of Lansing. The total partnership capital was to be $ 707,000, derived from petitioner's capital contribution as general partner and 25 limited partnership units of $ 23,333 each. [1] Petitioner also acquired one limited partnership unit at the stated price of $ 23,333, but there was no indication in the confidential memorandum that he would do so. The confidential memorandum stated that petitioner's compensation *277 as general partner would consist of a $ 42,000 initial management fee, an annual management fee of $ 2,500 in 1978 and each subsequent year of Lansing's existence, 2 percent annually of the partnership's distributions, profits, and losses resulting from operations, 20 percent of the residual proceeds and profits and losses resulting from the sale or refinancing of Lansing's property, and any funds left over from a set aside reserve after organizational, legal, accounting, and consulting expenses had been paid. In 1977, petitioner received $ 68,000 of income from Lansing, the agreed initial management fee of $ 42,000 for acting as general partner, and an additional $ 26,000. Petitioner received a Form 1099 from Lansing for the $ 26,000 and reported the entire $ 68,000 as income on petitioners' 1977 Federal income tax return. Petitioner, who described himself on his 1977 and 1978 Federal income tax returns as an independent insurance agent and consultant, was brought into the Lansing venture by Jack Isaacson, a principal in Lansing's promoter, Stonebridge, to raise the required partnership capital and to act as Lansing's general partner. As described in the confidential memorandum, *278 Stonebridge, in return for its services in putting the deal together, was to be given a 50-percent equity interest in Lansing Management, another limited partnership, which was to manage the system. Lansing Management's general partner was to be BFM, the firm designated to build, install, and operate the Lansing system, and Stonebridge was to be Lansing Management's limited partner. On June 2, 1977, as part of petitioner's undertaking to raise $ 707,000 for Lansing, petitioner gave Stonebridge a $ 20,000 refundable security binder, consisting of his note for $ 10,000 and his check for $ 10,000. In a letter dated June 2, 1977, Stonebridge acknowledged receipt of petitioner's note and check. Petitioner had to raise the $ 707,000 for Lansing within a specified time or he would have forfeited the security binder. The binder provided additional assurance that petitioner would have an interest in the outcome of the Lansing venture and that he would make the efforts needed to raise the money. Petitioner raised the $ 707,000 and soon thereafter Stonebridge returned his $ 10,000 note, but not the amount represented by his $ 10,000 check, which had been cashed. On June 5, 1978, after *279 petitioner had threatened Stonebridge with a lawsuit, Jack Isaacson sent petitioner a handwritten memorandum on Stonebridge letterhead, apologizing for the delay in returning petitioner's check. On October 2, 1978, Stonebridge attempted to repay the additional $ 10,000, but the check mailed by Stonebridge to petitioner, which was drawn on First Capital Bank Ltd., Kingstown, St. Vincent, W.I., was returned for insufficient funds, and it was not until February 8, 1979, after petitioner's bank retransmitted the check for collection, that petitioner finally received an advice from his bank that his account had been credited with $ 9,994.38 in respect of this transaction. Petitioner included $ 10,000 from Stonebridge as part of the fees and commissions income shown on Schedule C of his 1978 Federal income tax return. For 1978, Lansing issued a Schedule K-1 showing a $ 16,850 guaranteed payment to petitioner, and a guaranteed payment in this amount was shown on the face of Lansing's Form 1065, which was prepared by a firm of certified public accountants. Petitioner's Schedule K-1 also showed a distributive share of ordinary loss of $ 18,125 in respect of his 2-percent general partnership *280 interest. Petitioners' 1978 Federal income tax return netted the guaranteed payment and that ordinary loss, and reported $ 1,275 as petitioner's distributive share of loss as general partner of Lansing. Respondent's statutory notice disallowed the $ 18,125 ordinary loss, thereby increasing petitioners' taxable income by the amount of the denied loss. The statutory notice also disallowed the distributive share of ordinary loss in the amount of $ 29,604 claimed by petitioner in respect of his 3.2666-percent limited partnership interest in Lansing. In 1989, petitioner and respondent entered into a Form 906 closing agreement (signed by petitioner in 1988) providing, among other things, that petitioner's distributive share of Lansing's partnership loss for 1977 would be $ 30,333, his cash investment in the partnership, that he would not be entitled to any losses or deductions with respect to Lansing in any year before or after 1977, and that Lansing partnership distributions would be includable as ordinary income by petitioners in the year received. Respondent's deficiency notice to petitioner was issued in 1991. Respondent's "EXPLANATION OF PARTNERSHIP ADJUSTMENTS" to the deficiency *281 notice determined that Lansing's activities were not activities entered into for profit under section 183(a), or in the alternative, that Lansing had not incurred the benefits and burdens of ownership or shown that it had, in substance, a true economic investment in the community antenna television system. The "EXPLANATION" went on to specify a number of other reasons for the disallowance, at the partnership level, of depreciation (failure to establish cost, depreciable basis, fair market value, and useful life; alternatively, the note included in cost lacked economic substance), interest (nonrecourse loan contingent, failure to show interest was paid or incurred or "for the purpose stated"), and other partnership expenses, including the guaranteed payment of $ 16,850 whose inclusion in petitioner's income is one of the issues in this case (not substantiated, or should be capitalized, and was unreasonable and excessive). Respondent's "EXPLANATION" also referred to the closing agreement, stating: It is further determined that all items of losses and deductions are not deductible by you and that all partnership distributions are includable in your income and that no investment *282 credit is allowable with respect to Lansing Cable T.V. Co. before or after 1977 as per closing agreement signed by you on August 14, 1988. This Form 906 closing agreement is binding and the adjustments in this report reflect the terms of the closing agreement.
Petitioners' pro se petition, although it stated that the entire deficiency determined by respondent was in dispute, only alleged errors, and facts on which the errors were based, with respect to their claim that petitioner had not received any guaranteed payment from Lansing or income from Stonebridge during the taxable year. Prior to trial respondent moved for an order to show cause why petitioners' should not be bound by the closing agreement pertaining to their investment in Lansing. We granted the motion, and petitioner, rather than filing a response, promptly entered into the stipulation of settled issues described in the introduction to this opinion. Although the petition did not refer to the section 6621(c) issue, petitioner's handwritten brief did attempt to address the profit motive issue under section 183 by asserting that Lansing was sold for $ 2.4 million in 1987, resulting in a profit to investors, but *283 he had not produced any evidence of the sale at trial. Respondent's answer, in its final prayer for relief, requested: That the Court determine the portion of such deficiency for the taxable year 1978 which constitutes a substantial underpayment attributable to a tax motivated transaction, for purposes of computing the interest payable with respect to such amount, pursuant to I.R.C. section 6621(c), formerly 6621(d).
Respondent's brief and reply brief rely on petitioner's burden of proof on all issues, but merely conclude, based on the similarity of the Lansing format with the Finoli and Carlson cases, that "It follows that the determination of the Commissioner respecting section 6621(c) should be sustained". Northwest Houston Properties was a partnership that owned an apartment complex in Houston, Texas. Petitioner was a general partner of that partnership. The ground stated in the statutory notice for the partial disallowance of the loss claimed on the 1978 return in respect of that partnership was "the examination of the books and records of the partnership". OPINION Issue 1: Lansing's Guaranteed Payment. Section 707(c) provides that a guaranteed *284 payment to a partner is included in the partner's gross income under section 61(a) and is deductible by the partnership under section 162(a). Sec. 1.707-1(c), Income Tax Regs.Section 707(c) requires a matching of income and deductions based upon the partnership's accounting method. The recipient of a guaranteed payment therefore must include it as income in his taxable year that includes the end of the partnership's taxable year for which the partnership deducted the payment. Id. It follows, if Lansing made a $ 16,850 guaranteed payment to petitioner in 1978 and deducted this amount on its 1978 partnership return, that petitioner must include the same amount in income for 1978. Clark v. Commissioner, T.C. Memo. 1982-401. Petitioner bears the burden of proving, by a preponderance of the evidence, that he incorrectly included the $ 16,850 in his 1978 gross income. Rule 142(a). We conclude that petitioner has failed to meet his burden of proof on this issue, and we sustain respondent's determination. Petitioner's problem with the $ 16,850 guaranteed payment arises from respondent's disallowance of petitioner's ordinary partnership loss deductions *285 in the statutory notice. Petitioner had reported a $ 1,275 loss, as general partner. The reported loss resulted from netting the guaranteed payment and petitioner's distributive share, as general partner, of Lansing's claimed ordinary loss. When respondent disallowed petitioner's $ 18,125 distributive share of partnership loss, to which petitioner agreed in the closing agreement, petitioner no longer had any loss to offset the $ 16,850 guaranteed payment. Neither petitioner's assertions nor the evidence substantiate his claim that he never received any payment from Lansing in 1978. Petitioner asserts that Lansing attempted to correct a mistake it had made in late 1977 by making a bookkeeping entry in 1978 to adjust its records. Petitioner further asserts that this bookkeeping entry was erroneously included in the guaranteed payment amount reported on Lansing's 1978 partnership return (Form 1065). However, petitioner has neither offered any evidence to substantiate this claim nor explained how the two events relate to each other. Petitioner also asserts that Lansing was unable to pay petitioner $ 16,850 in 1978 because it did not have enough money in a bank account at Irving *286 Trust. Although Lansing may not have been able to pay petitioner from the Irving Trust bank account, this would not foreclose the possibility that petitioner received the payment from some other source. Petitioner's assertions, without more, do not persuade us that Lansing did not make the guaranteed payment to petitioner in the amount originally reported by the partnership. Accordingly, petitioner is not entitled to exclude the $ 16,850 guaranteed payment from his Federal gross income for 1978. Issue 2: Stonebridge Payment. Petitioners' 1978 Federal Income tax return included $ 10,000 from Stonebridge in petitioner's Schedule C fees and commissions income. Petitioner asserts that he mistakenly included this amount in income in 1978 and that it was actually a return of the balance of his refundable security binder. Petitioner introduced into evidence a copy of Stonebridge's June 2, 1977, letter to petitioner, partially obscured by a superimposed photocopy of his $ 10,000 note. This letter acknowledged Stonebridge's receipt from petitioner of a $ 10,000 check, which Stonebridge referred to as part of the "refundable binder". The letter, coupled with petitioner's testimony, *287 satisfies us that petitioner paid Stonebridge $ 10,000 as part of the security binder, to be repaid to him if he raised $ 707,000 for Lansing. On October 2, 1978, Stonebridge attempted to repay petitioner the $ 10,000 payment. However, the check was returned by Stonebridge's bank for insufficient funds, and it was not until February 8, 1979, after petitioner's bank had sent the check back for collection a second time, that petitioner's bank account was credited with the net amount of $ 9,994.38 in respect of this transaction. Respondent argued that the amount petitioner received from Stonebridge in early 1979 was not a return of petitioner's security binder, but was a payment for a different transaction. Respondent based this conclusion on petitioner's inclusion in income of $ 10,000 from Stonebridge in 1980. However, even if Stonebridge made a $ 10,000 payment to petitioner in 1980 that was properly includable in income, we find that the Stonebridge payment credited to petitioner in early 1979 was a payment in respect of his security binder and that he mistakenly included $ 10,000 of gross income from Stonebridge in his 1978 gross income. Issue 3: Additional Interest under *288 Section 6621(c). Respondent determined that petitioner was liable for additional interest under section 6621(c). Respondent claims that petitioner's entire underpayment of 1978 Federal income tax is a substantial underpayment attributable to "tax motivated transactions" within the meaning of section 6621(c)(2). Section 6621(c)(3)(A) specifies transactions and reasons for adjustments that result in imposition of the 120-percent rate of interest, including valuation overstatements, failure to satisfy the "at-risk" rules of section 465(a), and any sham or fraudulent transaction. Section 6621(c)(3)(B) also confers authority on the Secretary to specify by regulation transactions that will be treated as tax-motivated transactions for purposes of 6621(c). Section 301.6621-2T, Q&A-4(1), Temporary Proced. and Admin. Regs., 49 Fed. Reg. 50392 (Dec. 28, 1984), includes within the category of tax-motivated transactions: "Any deduction disallowed for any period under section 183, relating to an activity engaged in by an individual or an S corporation that is not engaged in for profit". Under either of the above subparts of section 6621(c)(3), interest under section *289 6621(c) is due on the portion of the underpayment attributable to the disallowed deductions if that portion exceeds $ 1,000. Sec. 6621(c)(2). The closing agreement, which allowed petitioner to deduct Lansing losses claimed for 1977, a prior year not before us, to the extent of his cash investment, also provided for disallowance of any losses claimed in subsequent years, but did not express the legal theory or theories of the disallowance. Although petitioner's pro se petition stated that the entire amount of the deficiency determined by respondent was in dispute, it did not allege error or facts in respect of the disallowed Lansing and Northwest Houston Properties loss deductions, but only in respect of two income items, namely the guaranteed payment from Lansing and the $ 10,000 from Stonebridge. Respondent's answer did not mention that the income items disavowed by the petition were new matter in relation to the adjustments in the notice of deficiency. However, respondent's answer did ask the Court to determine "the portion of such deficiency for the taxable year 1978 which constitutes a substantial underpayment attributable to a tax motivated transaction, for purposes *290 of computing the interest payable with respect to such amount, pursuant to I.R.C. section 6621(c), formerly 6621(d)" (emphasis supplied). After respondent moved for -- and the Court issued -- an order to show cause why the Lansing deductions should not be disallowed by reason of the closing agreement, petitioner promptly entered into a stipulation of settled issues that conceded not only the disallowance of the Lansing deductions, but also respondents's partial disallowance of petitioner's loss with respect to Northwest Houston Properties. The parties' entry into the closing agreement and the stipulation of settled issues based thereon obviated the need for a trial on the numerous issues raised in the deficiency notice for the purpose of identifying which, if any of them, provided the substantive ground or grounds for disallowance of the Lansing loss. In McCrary v. Commissioner, 92 T.C. 827, 857-859 (1989) (reviewed), we declined to sustain the application of section 6621(c) when the taxpayer's concession made it unnecessary to decide which of several alternative grounds provided the ground for the disallowance. In the case at hand, respondent's deficiency *291 notice not only relied on the closing agreement to disallow the Lansing loss, but also threw in everything but the proverbial kitchen sink, both overall and with respect to three sets of specific items: Overall, the notice relied not only on lack of profit motive under section 183, but determined in the alternative that Lansing had not had the benefits of ownership or, in substance, a true economic investment in the community antenna television system; the notice also alleged a variety of specific grounds for the disallowance of depreciation (failure to establish cost, depreciable basis, fair market value or useful life, or the economic substance of the note included in cost), interest (contingent character of the obligation on the note and failure to show interest paid or incurred or "for the purpose stated"), and other deductions (lack of substantiation, capitalizable, unreasonable, and excessive). Here, as in McCrary v. Commissioner, supra, and Rogers v. Commissioner, T.C. Memo. 1990-619, the melange of alleged grounds, some of which were "tax-motivated" grounds -- but others were not -- prevent us from saying, *292 after the concession, that the underpayment was attributable to a particular ground. We are not inclined, in these circumstances, to rely on petitioners' burden of proof to show that the transaction was not tax motivated, all or in part, for the purpose of section 6621(c). The objectives of administrative efficiency and judicial economy have been well served by the closing agreement and petitioner's concession. Those objectives would not be served by requiring a trial on the substantive issues for the sole purpose of determining whether petitioner is liable for 20 percent more interest on the deficiency under section 6621(c). This case would be appealable, barring stipulation to the contrary, to the Court of Appeals for the Second Circuit. In Irom v. Commissioner, 866 F.2d 545 (2d Cir. 1989), vacating in part and remanding T.C. Memo. 1988-211, we disallowed certain deductions on the ground that they did not satisfy the requirements for minimum advance royalty payments under section 1.612-3(b)(3), Income Tax Regs., because the alleged payments were made by means of nonrecourse notes. The Court of Appeals for the Second *293 Circuit reversed because the ground for the disallowance appeared to be inseparable from the conclusion that the taxpayer was not "at risk", which is one of the statutory categories of "tax-motivated" transactions under section 6621(c), and remanded for a determination whether the grounds actually were inseparable. In contrast, the potpourri of grounds in the statutory notice in the case at hand in support of the disallowance of the Lansing losses are so disparate and disconnected that there are more than sufficient grounds on each issue that are not "tax-motivated" that no useful purpose would be served by a trial on these issues. Finally, there was a disallowance of part of the deduction attributable to Northwest Houston Properties. The ground for the disallowance stated in the statutory notice is not clear, but, inasmuch as it was based on "examination of the books and records, of the partnership" it would appear to be lack of substantiation. There was no closing agreement on this issue, although petitioner also conceded it before trial. The portion of the deficiency attributable to this $ 2,155 adjustment will be less than $ 1,000; therefore it is not large enough by itself *294 to give rise to a "substantial underpayment" within the meaning of section 6621(c)(2). In these circumstances, no additional interest is due on this or any portion of the recomputed deficiency. To reflect the foregoing, and petitioner's concessions, Decision will be entered under Rule 155. Footnotes
1. The confidential memorandum contains an arithmetical error, inasmuch as 25 X $ 23,333.33 is less than $ 700,000. However, petitioner testified without contradiction that he did raise $ 707,000 for Lansing.↩