JEFFREY K. AND KRISTINE K. BERGMANN, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket No. 20894–05.          Filed October 11, 2011.

Ps participated in a transaction promoted by KPMG, LLP
(KPMG), that was the same as or substantially similar to a
tax avoidance transaction described in Notice 2000–44, 2000–
2 C.B. 255. R served KPMG with a summons concerning
transactions described in Notice 2000–44, *supra*. The parties
dispute whether the summons terminated the period for Ps to
file a qualified amended return (QAR) under sec. 1.6664–
2(c)(3), Income Tax Regs. Ps concede they are liable for a 20-
percent accuracy-related penalty under sec. 6662(a), I.R.C., if
they failed to file a QAR. R asserts Ps are liable for a 40-per-
cent accuracy-related penalty for a gross valuation
misstatement (gross valuation penalty) under sec. 6662(h),
I.R.C., if Ps failed to file a QAR. The parties dispute whether
Ps' concession that they were not entitled to the deductions
that gave rise to the 2001 tax underpayment precludes Ps'
underpayment from being attributable to a gross valuation
misstatement within the meaning of sec. 6662(h), I.R.C. *Held*:
The period to file a QAR terminated before Ps filed the
amended return. *Held*, *further*, Ps' tax underpayment was not
attributable to a gross valuation misstatement. Ps are there-
fore not liable for the gross valuation penalty.

*Ronald B. Schrotenboer*, *Kenneth B. Clark*, and *Brad A.
Bauer*, for petitioners.
*Gerald A. Thorpe*, for respondent.

KROUPA, *Judge*: Respondent determined deficiencies in and
accuracy-related penalties under section 6662(a)[1] for peti-
tioners' Federal income taxes for 2001 and 2002. Respondent
has since conceded that petitioners are not liable for the 2001
and 2002 deficiencies in tax and the 2002 accuracy-related
penalty. Petitioners concede they had a tax underpayment
for 2001 if they failed to file a qualified amended return
(QAR) under section 1.6664–2(c)(3), Income Tax Regs. They
further concede they are liable for a 20-percent accuracy-
related penalty of $41,196 if they failed to file a QAR. There
remain two issues for decision. The first is whether peti-
tioners filed a QAR for 2001. We hold they did not. The

---

[1] All section references are to the Internal Revenue Code (Code) in effect for the year at issue,
unless otherwise indicated.

136

second is whether petitioners are liable for a 40-percent gross valuation penalty rather than the 20-percent penalty petitioners concede. We hold they are liable for the 20-percent accuracy-related penalty.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. We incorporate the stipulation of facts and the accompanying exhibits by this reference. Petitioners resided in Pleasanton, California, at the time they filed the petition.

*Background*

Petitioner Jeffrey K. Bergmann (Bergmann) worked at KPMG, LLP (KPMG). KPMG is and has long been one of the largest audit and tax service providers to many of the world's largest corporations. Bergmann worked in KPMG's Stratecon group as a tax partner from 2000–2001. Stratecon focused on designing, promoting and implementing aggressive tax planning strategies for high-net-worth individuals. Bergmann met David Greenberg (Greenberg) while working in the Stratecon group. Bergmann and Greenberg both worked on a tax planning strategy known as the Short Option Strategy (SOS).

SOS involved entering into a foreign exchange option transaction, in which investors entered into two substantially offsetting option contracts with a bank, a long contract and a short contract.[2] The investor, upon entering into an SOS transaction, would transfer the long contract to a partnership or limited liability company (LLC), which would assume the investor's obligation under the short contract. Usually a short time thereafter, the investor would withdraw from the partnership or LLC and receive a liquidating distribution. The investor's liquidating distribution would consist primarily of foreign currency. When computing gain or loss on the sale of the foreign currency, the investor would report a basis in the foreign currency equal to the purportedly paid premium to

---

[2] The long contract obligated the bank to pay the client a certain amount if on the determination date the exchanges equaled or exceeded the exchange rate indicated in the contract. The short contract obligated the client to pay the bank a certain amount if on the determination date the exchanges equaled or exceeded the exchange rate indicated in the contract.

acquire the long contract and would not treat the short contract as a liability for purposes of section 752.

Starting around 2000, Greenberg began organizing and coordinating transactions that were the same as or substantially similar to SOS transactions (SOS-like transactions) for KPMG clients (clients) and KPMG partners (partners). Greenberg assisted at least seven partners, including Bergmann, with SOS-like transactions during 2000–2001. Greenberg performed substantially the same acts in organizing and coordinating SOS-like transactions for clients and partners. He would design planning strategies for clients and partners. He would also coordinate the brokerage and legal services required to effect the SOS-like transactions for clients and partners.

Greenberg structured and facilitated Bergmann's entry into an SOS-like transaction in 2000 (2000 transaction) and again in 2001 (2001 transaction). The 2000 transaction was the same as or substantially similar to a transaction described in Notice 2000–44, 2000–2 C.B. 255 (transactions generating losses by artificially inflating basis) (Notice 2000–44).

Bergmann did not compensate Greenberg or KPMG for the 2000 transaction and the 2001 transaction. Bergmann confirmed, however, in a letter to his brokerage service provider, Deutsche Bank Alex Brown (DB Alex Brown), a subsidiary of Deutsche Bank AG, that he had obtained qualified tax advice on the 2000 transaction from his accountant KPMG and specifically Greenberg. He also stated in the letter that DB Alex Brown should contact his accountant KPMG and specifically Greenberg if any questions or issues arose with the 2000 transaction.

*Respondent's Investigation of KPMG for Section 6700 Liability*

Respondent sent a letter to KPMG in October 2001, notifying KPMG that he was considering imposing penalties on KPMG for promoting abusive tax shelters. Respondent later notified KPMG by letter in February 2002 that he was conducting an examination to determine KPMG's liability for organizing various tax shelters from 1994 to the present.

Respondent clarified the scope of his investigation on March 19, 2002, by serving two summonses on KPMG, requesting documents, records and testimony relating to its tax shelter activities. These summonses explicitly state they concern an examination of KPMG for liability under section 6700 (regarding a promoter penalty), among other provisions of the Code. One of the summonses narrows the investigation's scope by defining the transactions to which it applies. Specifically, the summons defines the transaction at issue as one that is the same as or substantially similar to a transaction described in Notice 2000–44 (Notice 2000–44 summons).

KPMG provided respondent a list of clients it believed had engaged in the transactions described in Notice 2000–44 in response to the Notice 2000–44 summons. The list did not include Bergmann. More than two years later, KPMG provided respondent a revised list. The revised list included Bergmann's 2000 transaction but not his 2001 transaction.

*Petitioners' Federal Income Tax Return for 2001*

Petitioners timely filed a Federal income tax return for 2001 (original return). Petitioners claimed a $346,609 ordinary loss for the 2000 transaction. Petitioners also claimed a $295,500 long-term capital loss for the 2001 transaction. Petitioners filed an amended Federal tax return for 2001 in March 2004 (amended return). Petitioners removed the losses attributable to the 2000 transaction and the 2001 transaction on the amended return and reported and paid $205,979 of additional tax. They did not concede, however, that the losses were improperly reported. Nor did they foreclose themselves from taking another position on another amended return.[3] Respondent credited the tax payment to petitioners' account. A year after receiving the amended return, respondent informed petitioners that the 2001 return was being audited.

Respondent subsequently issued the notice of deficiency in which he determined deficiencies in petitioners' Federal

---

[3] Petitioners have since conceded that they were not entitled to any deductions attributable to the losses generated by the 2000 transaction and the 2001 transaction.

income taxes and accuracy-related penalties for 2001 and 2002. [4]

Petitioners timely filed a petition.

OPINION

We are asked to decide for the first time whether the Commissioner must impose a promoter penalty under section 6700 (relating to abusive tax shelters) to terminate the time to file a QAR under section 1.6664–2(c)(3)(ii), Income Tax Regs. (the promoter provision). Petitioners essentially argue that respondent failed to establish that KPMG is liable for a promoter penalty under section 6700 and therefore the time to file a QAR never terminated. If petitioners failed to file a QAR, we need to decide whether they are liable for the gross valuation penalty for 2001.

I. *Whether Petitioners Filed a QAR*

We begin by explaining the general rules for filing a QAR. A taxpayer can avoid having an underpayment and the imposition of an accuracy-related penalty by filing a QAR. A QAR treats additional tax reported on an amended return as tax reported on the original return. Sec. 1.6664–2(c)(2), Income Tax Regs. A QAR is an amended return that is filed before certain terminating events. Respondent contends that the period to file a QAR terminated under the promoter provision before petitioners filed the amended return. Respondent does not contend that the period to file a QAR terminated under any of the other subdivisions of section 1.6664–2(c)(3), Income Tax Regs. Accordingly, we focus our attention on the promoter provision.

Under the promoter provision, the period to file a QAR terminates when the IRS first contacts a person concerning liability under section 6700 (a promoter investigation) for an activity with respect to which the taxpayer claimed a tax benefit. Sec. 1.6664–2(c)(3)(ii), Income Tax Regs. Petitioners argue that respondent must establish that the person con-

---

[4] The Court assumes that respondent determined that the partnership involved in the 2000 transaction was a small partnership within the meaning of the small partnership exception, see sec. 6231(a)(1)(B)(i), and that it was not subject to the unified partnership audit and litigation procedures of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97–248, sec. 402(a), 96 Stat. 648. Even if that determination were erroneous, the TEFRA provisions would not apply. See sec. 6231(g)(2).

tacted about a promoter investigation is in fact liable for a promoter penalty under section 6700 (the penalty requirement). We do not find any penalty requirement in the promoter provision.[5] Respondent need not have found KPMG liable for the promoter penalty under section 6700. We therefore reject petitioners' argument.

We focus now on the facts. The period to file a QAR will have terminated for petitioners when respondent first contacted KPMG about a promoter investigation if the promoter investigation covered either the 2000 transaction or the 2001 transaction.[6] We now turn to these issues.

### A. *Whether KPMG Was Under Investigation Before Petitioners Filed the Amended Return*

Petitioners filed the amended return for 2001 on March 15, 2004. This is the dispositive date by which respondent had to contact KPMG concerning a promoter investigation. Respondent served KPMG with two summonses on March 19, 2002. These summonses explicitly stated that they concerned the liability of KPMG under section 6700. We find that respondent contacted KPMG about a promoter investigation before petitioners filed the amended return. We now consider whether the promoter investigation covered either the 2000 transaction or the 2001 transaction.

### B. *Whether Respondent's Investigation of KPMG Covered the 2000 Transaction or the 2001 Transaction*

Petitioners argue that Greenberg acted in his individual capacity, not on behalf of KPMG, when he organized and coordinated petitioners' 2000 transaction and 2001 transactions and therefore the promoter investigation of KPMG cannot cover the 2000 transaction and the 2001 transaction.[7] We agree that respondent's investigation of KPMG may cover only transactions that KPMG promoted. Accordingly, we first

---

[5] A U.S. District Court also rejected the argument that the promoter provision includes the penalty requirement. See *Sala v. United States*, 100 AFTR 2d 2007–5097, 2007–2 USTC par. 50,567 (D. Colo. 2007). We note that this decision is not binding on us. See *infra* pp. 143–144.

[6] The 2000 transaction and the 2001 transaction are the activities at issue, as these are the transactions from which petitioners claimed losses (tax benefits) on the original return and which were later eliminated on the amended return.

[7] We find petitioners' argument curious, given they indicated in a letter to DB Alex Brown that it should contact their accountant KPMG and specifically Greenberg if any questions or issues arose in connection with the 2000 transaction.

address whether Greenberg's acts are attributable to KPMG. If they are, we then decide whether any of the summonses served on KPMG cover the 2000 transaction or the 2001 transaction.

1. *Whether Greenberg's Acts Are Attributable to KPMG*

The parties agree that California agency and partnership law controls. Partners are agents of the partnership for the purpose of its business under California law. Cal. Corp. Code sec. 16301 (West 2006). An act by a partner that is apparently within the usual course of partnership business is binding on the partnership unless the partner had no authority to act and the person dealing with the partner knew the partner had no authority to act. See *id.*; *Owens v. Palos Verdes Monaco*, 191 Cal. Rptr. 381, 385 (Ct. App. 1983). The apparent scope of partnership business depends on the conduct of the partners and the partnership. See *Blackmon v. Hale*, 463 P.2d 418 (Cal. 1970).

We now look to the scope of KPMG's partnership business. The conduct of KPMG's Stratecon group and the conduct of Greenberg are relevant to determining the scope of KPMG's partnership business. Stratecon was responsible for designing, promoting and implementing tax strategies, including SOS-like transactions. Greenberg was hired specifically to work in this group. Greenberg regularly organized and coordinated SOS-like transactions for clients and for at least seven partners during the years at issue. He performed substantially the same acts in organizing and coordinating SOS transactions for both clients and partners. On the basis of KPMG's conduct and Greenberg's conduct, we find that the scope of KPMG's partnership business included organizing and coordinating SOS-like transactions for both clients and partners.

Now we must determine whether the 2000 transaction and the 2001 transaction were within the scope of KPMG's partnership business. Simply put, they were. First, the 2000 transaction and the 2001 transaction were SOS-like transactions, the same transactions Greenberg promoted to clients and partners. Second, Greenberg assisted petitioners with the 2000 transaction and the 2001 transaction during the period that he worked in the Stratecon group and assisted

clients and partners with SOS-like transactions. We find that the 2000 transaction and the 2001 transaction were within the scope of KPMG's partnership business and specifically within the scope of Greenberg's responsibilities as a KPMG partner.

Finally, we look at whether KPMG expressly limited Greenberg's apparent authority to organize and coordinate SOS-like transactions for partners. Petitioners relied solely on Bergmann's testimony to show that Greenberg was not authorized to organize and coordinate SOS-like transactions for partners. Bergmann testified that partners, to the best of his knowledge, were not permitted to perform services without obtaining a fee. We find Bergmann's after-the-fact testimony to be self-serving. We are unable to place any weight on this testimony.

The record shows that there was no limitation on Greenberg's apparent authority. Petitioners failed to introduce any agreement (e.g., a partnership agreement) that in fact limits Greenberg's apparent authority. Additionally, Greenberg organized and coordinated SOS-like transactions for at least six other partners during this same period. Moreover, nothing in the record indicates that KPMG ever objected to Greenberg's assisting partners.

We find that KPMG did not limit Greenberg's apparent authority. Accordingly, we further find that Greenberg was acting as agent for KPMG with respect to the 2000 transaction and the 2001 transaction. Consequently, we turn our attention to whether the summonses served on KPMG cover either the 2000 transaction or the 2001 transaction.

### 2. *Whether at Least One of the Summonses Covers the 2000 Transaction or the 2001 Transaction*

Respondent's promoter investigation of KPMG will cover petitioners' 2000 and 2001 transactions only if it was "concerning" an "activity" from which petitioners claimed a tax benefit. The parties disagree on the degree of specificity respondent must use to reference an "activity" in a summons for the summons to "[concern]" an "activity." Petitioners argue that the promoter provision must be interpreted narrowly and that the summons must specifically identify an activity; e.g., the "Deerhurst Program." Petitioners rely upon

*Sala v. United States*, 552 F. Supp. 2d 1167, 1204 (D. Colo. 2008), revd. on another issue 613 F.3d 1249 (10th Cir. 2010). In *Sala*, the taxpayer participated in a foreign currency investment known as the "Deerhurst Program." *Id.* at 1175. The court in *Sala* held that the Government's contacting KPMG concerning a promoter investigation did not terminate the period to file a QAR because KPMG was not specifically contacted regarding "Deerhurst". *Id.* at 1204. Decisions of U.S. District Courts are not binding on this Court. See *Friedman v. Commissioner*, T.C. Memo. 2010–45. We are therefore not bound by the decision in *Sala*.

Respondent argues that a summons will cover a transaction if it refers to (at least) the type of transaction that the taxpayer participated in; e.g., "a transaction that is the same or substantially similar to a transaction described in Notice 2000–44." We agree. Petitioners read the promoter provision too narrowly. We agree with respondent that a summons will cover a transaction if it refers to the type of transaction in which the taxpayer participated.

Here, the Notice 2000–44 summons refers to all transactions that are the same as or substantially similar to a transaction described in Notice 2000–44. The 2000 transaction is the same as or substantially similar to a transaction described in Notice 2000–44. Thus, the Notice 2000–44 summons refers to the type of transaction in which petitioners participated. We therefore find that the Notice 2000–44 summons covers the 2000 transaction.

We note that respondent's interpretation of the promoter provision and our conclusion that the Notice 2000–44 summons covers the 2000 transaction are consistent with the purpose of the promoter provision. The purpose of the promoter provision is to encourage taxpayers to voluntarily disclose abusive tax shelters. See T.D. 9186, 2005–1 C.B. 790. Respondent's interpretation effects this purpose by terminating the period to file a QAR when disclosure would no longer be voluntary, as in this case.

Petitioners could reasonably conclude that respondent would discover their 2000 transaction once KPMG was served the Notice 2000–44 summons. Accordingly, disclosure after the Notice 2000–44 summons was served on KPMG would not have been voluntary. In stark contrast, under petitioners' interpretation, the Notice 2000–44 summons would not

terminate the period to file a QAR and would thus allow petitioners to file a QAR when disclosure would no longer be voluntary.

We ultimately conclude that the amended return petitioners filed was not a QAR since it was filed after respondent issued KPMG the Notice 2000–44 summons. Consequently, the additional tax stated on the amended return is not includable in the amount of tax shown on the original return. Petitioners therefore had an underpayment of tax for 2001 equal to the additional tax reported on the amended return.

## II. *Whether Petitioners Are Liable for the Gross Valuation Penalty*

We now must focus on whether petitioners are liable for a 40-percent gross valuation penalty under section 6662(h). A taxpayer is liable for the gross valuation penalty on any portion of an underpayment attributable to a gross valuation misstatement. Sec. 6662(h). The parties dispute whether petitioners' concession that they were not entitled to the loss deductions that gave rise to the 2001 underpayment (losses at issue) precludes the imposition of the gross valuation penalty.

We have held that when the Commissioner asserts a ground unrelated to value or basis of property for totally disallowing a deduction or credit and a taxpayer concedes the deduction or credit on that ground, any underpayment resulting from the concession is not attributable to a gross valuation misstatement. See *McCrary v. Commissioner*, 92 T.C. 827, 851–856 (1989). We have extended our holding to situations where the taxpayer does not state the specific ground upon which the concession of the deduction or credit is based so long as the Commissioner has asserted some ground other than value or basis for totally disallowing the relevant deduction or credit. See *Rogers v. Commissioner*, T.C. Memo. 1990–619; see also *Schachter v. Commissioner*, T.C. Memo. 1994–273.

In this case, petitioners conceded "on grounds other than regarding the value or basis of the property" that they were not entitled to deduct any portion of the losses at issue. Petitioners argue that there is a ground other than value or basis for conceding the losses at issue in full because respondent

has consistently alleged that the 2000 transaction and the 2001 transaction lacked economic substance and were engaged in solely for tax avoidance purposes. We agree. Both the economic substance and tax avoidance doctrines, if successfully employed, would result in the total disallowance of the losses at issue without regard to the value or basis of the property used in the 2000 transaction and the 2001 transaction. See *Leema Enters., Inc. v. Commissioner*, T.C. Memo. 1999–18, affd. sub nom. *Keeler v. Commissioner*, 243 F.3d 1212 (10th Cir. 2001). Nevertheless, we have held that the gross valuation penalty applies when an underpayment stems from deductions or credits that are disallowed because of lack of economic substance. See *Petaluma FX Partners, LLC v. Commissioner*, 131 T.C. 84, 104–105 (2008), affd. in pertinent part, revd. in part and remanded 591 F.3d 649 (D.C. Cir. 2010).

Petitioners argue that under Court of Appeals for the Ninth Circuit precedent the gross valuation penalty may not be imposed when a deduction or credit may be disallowed because of tax avoidance or lack of economic substance. Petitioners further argue that this is the case even when the deduction or credit stems from a tax avoidance scheme lacking economic substance that involves overvaluation of property. We follow the Court of Appeals decision squarely on point when appeal from our decision would lie to that court absent stipulation by the parties to the contrary. *Golsen v. Commissioner*, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971). This case is appealable to the Court of Appeals for the Ninth Circuit. That court, recognizing that in many Federal circuits the gross valuation penalty applies "when overvaluation is intertwined with a tax avoidance scheme that lacks economic substance", held that it was constrained under its own precedent from applying the gross valuation penalty in that situation. *Keller v. Commissioner*, 556 F.3d 1056, 1061 (9th Cir. 2009), affg. in part, revg. in part and remanding T.C. Memo. 2006–131. Because this case is appealable to the Court of Appeals for the Ninth Circuit, we follow that court's precedent.

Accordingly, we conclude that the underpayment for 2001 is not attributable to a gross valuation misstatement and that petitioners are not liable for a 40-percent gross valuation penalty. Petitioners are liable, however, for the 20-per-

cent accuracy-related penalty of $41,196 on the basis of their concession.

We have considered all arguments the parties made in reaching our holdings, and, to the extent not mentioned, we find them irrelevant or without merit.

To reflect the foregoing,

*Decision will be entered for respondent.*